UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------x

UNITED STATES OF AMERICA          :

    - v. -                                  :          08 Cr. 124 (DLC)

JOSEPH JORDAN,                        :

                Defendant.          :

-------------------------------------------------x


**JOSEPH JORDAN'S MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION FOR MISJOINDER AND/OR SEVERANCE
AND TO SUPPRESS THE EVIDENCE SEIZED DURING
HIS JANUARY 11, 2008 AND MARCH 3, 2008 ARRESTS**


LEONARD F. JOY, ESQ.
Federal Defenders of New York
Attorney for Defendant
**JOSEPH JORDAN**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8734

**FIONA DOHERTY, ESQ.**
Of Counsel


TO:    MICHAEL J. GARCIA, ESQ.
       United States Attorney
       Southern District of New York
       One Saint Andrew's Plaza
       New York, New York 10007
       Attn: **HOWARD MASTER, ESQ.**
           Assistant United States Attorney

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.   COUNTS ONE THROUGH THREE ARE IMPROPERLY JOINED WITH COUNTS
     FOUR THROUGH TEN UNDER FED.R.CRIM.P. 8(A). . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.  COUNTS ONE THROUGH THREE SHOULD BE SEVERED FROM COUNTS
     FOUR THROUGH TEN UNDER FED.R.CRIM.P. 14(A) . . . . . . . . . . . . . . .. . . . . . . . . . . 11

III. THE EVIDENCE AND DOCUMENTS SEIZED FROM MR. JORDAN AFTER
     HIS JANUARY 11, 2008 AND MARCH 3, 2008 ARRESTS MUST BE
     SUPPRESSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     A.   Inventory Searches Must Follow a Standardized Procedure and Cannot Be Used
          as a Pretext to Search for Inculpatory Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

     B.   The Search of Mr. Jordan's Property Following His January 11, 2008 Arrest
          Was Improper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

     C.   The Search of Mr. Jordan's Property Following His March 3, 3008 Transfer to
          Federal Custody Was Improper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

UNITED STATES OF AMERICA          :

    - v. -                          :          08 Cr. 124 (DLC)

JOSEPH JORDAN,                    :

           Defendant.          :

-----------------------------------------------------x

### JOSEPH JORDAN'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR MISJOINDER AND/OR SEVERANCE AND TO SUPPRESS THE EVIDENCE SEIZED DURING HIS JANUARY 11, 2008 AND MARCH 3, 2008 ARRESTS

### INTRODUCTION

The defendant, Joseph Jordan, respectfully submits this memorandum of law in support

of his motion: (1) to sever the first three counts of the superseding indictment from the remaining

seven counts under Rules 8(a) and 14(a) of the Federal Rules of Criminal Procedure; and (2) to

suppress the evidence seized during his initial January 11, 2008 arrest and his subsequent March

3, 2008 transfer from state into federal custody.

The first three counts of the indictment relate to threatening communications allegedly

made by Mr. Jordan to Simone Thenault (his former girlfriend), Ambassador Glenda Morean-

Phillip (Ms. Thenault's aunt), and other members of Ms. Thenault's family. The remaining

seven counts all concern allegations of fraud, including charges of mail fraud, aggravated identity

theft, and access device fraud. The three threat counts are improperly joined with the seven fraud

counts under Rule 8(a) because the two sets of counts are not of the same or similar character, do

not involve the same acts or transactions, and are not part of a common scheme or plan. Trying

the two sets of counts together would also cause Mr. Jordan substantial prejudice under Rule

14(a).

The arresting officers seized materials from Mr. Jordan following his January 11, 2008

arrest in Manhattan and following his March 3, 2008 transfer from Riker's Island into federal

custody. Subsequent to each arrest, the authorities conducted unlawful searches of Mr. Jordan's

property in order to find incriminatory evidence against him. In particular, the officers sorted

through and read the documents and materials in Mr. Jordan's possession and used the

information from these items to further their investigation in this case. As a result, the evidence

obtained as a result of each unlawful search – and all evidence derived therefrom – must be

suppressed under the Fourth Amendment to the United States Constitution.

## STATEMENT OF FACTS

Joseph Jordan was arrested by the FBI on January 11, 2008 in the vicinity of Essex Street

in Manhattan. See June 13, 2008 Affirmation of Fiona Doherty ("Doherty Aff.") ¶ 3 (citing

Exhibit A ¶ 9). He was arrested pursuant to an arrest warrant that had been issued by the District

of Connecticut for unlawful flight to avoid prosecution in violation of 18 U.S.C. § 1073. Id.

After his arrest, Mr. Jordan would not tell the arresting officers where he resided. Id. The

officers seized a wallet and other materials from Mr. Jordan following his arrest. Id. Among the

materials seized by the officers was a January 9, 2008 affidavit, apparently prepared by Mr.

Jordan, relating to a claim by Ms. Thenault's mother that Mr. Jordan had threatened to harm her

on December 18, 2007. See Doherty Aff. ¶ 3 (citing Exhibit B). Following his January 11, 2008

2

arrest, Mr. Jordan was taken into state custody and held at Riker's Island. Id. (citing Exhibit C).

He was charged in the New York State system with harassing Ms. Thenault's mother, Diana

Dodson. Id.

On February 6, 2008, an unidentified law enforcement officer conducted what the FBI

claims was a "routine inventory search" of Mr. Jordan's wallet. Id. ¶ 4.  In searching Mr.

Jordan's wallet, the officer recovered a "business card of a car service company that contained a

handwritten note listing the address" of a building, located at 2773 Reservoir Avenue, Bronx,

New York, 10468 (the "Building"). Id. (citing Exhibit D).  That same day, two detectives with

the New York City Police Department (the "NYPD") "traveled to the Building to determine if

the building contained Jordan's residence." Id. (citing Exhibit A ¶ 11).  The NYPD detectives

interviewed a resident of the Building, who recognized a picture of Mr. Jordan and confirmed

that Mr. Jordan lived on the second floor of the Building. Id.  The next day, one of the NYPD

detectives returned to the Building with Special Agent Brandon Waller of the FBI. Id. (citing

Exhibit A ¶ 12).  The officers interviewed two residents of the Building, examined the common

areas of the premises, and inspected materials and boxes that they believed belonged to Mr.

Jordan. Id.  This information was then used to seek a federal search warrant of the second floor

of the Building, which was issued by Judge Eaton on February 8, 2008. Id. (citing Exhibit A at

p. 1).

Other materials were also allegedly recovered during the "inventory search" of Mr.

Jordan's wallet. Id. ¶ 5.  Additional materials found in the wallet (and referenced in the search

warrant affidavit) include a bank debit card in the name of "Joseph Landa" and a card with Mr.

Jordan's cell phone provider and the following language: "DF last 4: 6522." Id. (citing Exhibit A
¶ 17).  Other items seized from the wallet include access devices and checks in the name of
Patrick Jordan, bank records, receipts, business cards, documents relating to a voicemail service,
and listings of contact details and telephone numbers.  Id.  Copies of these items were provided
by the government in discovery.  Id.

On March 3, 2008, Mr. Jordan was arrested at Riker's Island by Special Agent Waller and
Detective Paul Courtney subsequent to a three-count indictment obtained in the Southern District
of New York on February 14, 2008.  Id. ¶ 6 (citing Exhibit E).  He was then brought to the FBI
offices at 26 Federal Plaza for processing and to be interviewed.  Id.  Subsequent to his March 3,
2008 arrest, documents were also seized from his possession.  Id. ¶ 6.  These documents, which
were provided to the defense in discovery, include materials that Mr. Jordan had prepared
regarding allegations that he had threatened Ms. Thenault, her mother, and her aunt (Ambassador
Glenda Morean-Phillip).  Id.  The documents seized on March 3, 2008 also included such
materials as Mr. Jordan's hand-written notes, the contact details for his friends, family and
potential witnesses in his case, and a letter written to a friend.  Id.

On the afternoon of March 3, 2008, Mr. Jordan was presented before the Honorable
Ronald Ellis on a three-count indictment. Id. ¶ 7.  On May 1, 2008, the government obtained a
superseding indictment, which contains seven additional counts.  See Indictment.  The original
three counts all deal with threatening communications.  Id.  The seven new counts all concern
allegations of financial fraud.  Id.

4

Count One of the indictment charges Mr. Jordan with a violation of 18 U.S.C. § 875(c), which provides as follows:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(c). In reciting the facts on which the charge is based, Count One alleges that Mr. Jordan "made telephone calls, and sent e-mails and facsimiles, in which [he] threatened to kidnap his former girlfriend ("Victim-1"), and to injure the person of Victim-1, Victim-1's aunt ("Victim-2"), and other members of Victim-1's immediate family." See Indictment. This conduct allegedly occurred between December 2007 and January 11, 2008. Id.

Count Two charges Mr. Jordan with a violation of 18 U.S.C. § 878, which makes it a crime to "knowingly and willfully threaten[] to violate section 112, 1116, or 1201." 18 U.S.C. § 878. The indictment claims that Mr. Jordan violated 18 U.S.C. § 878 by making threats: (a) to "assault, strike, wound, imprison, offer violence to, and to violently attack the person of, and to make a violent attack on the private accommodation of an internationally protected person" in violation of 18 U.S.C. § 112(a); and (b) "to seize and confine an internationally protected person" in violation of 18 U.S.C. § 1201(a)(4). See Indictment. According to the indictment: "Jordan made telephone calls, and sent e-mails and facsimiles, in which Jordan threatened to attack the residence of Victim-2, who is an internationally protected person, and to seize and harm Victim-2 if Victim-2 resisted Jordan's efforts to kidnap Victim-1." Id. The indictment claims that this conduct occurred between December 2007 and January 11, 2008. Id.

5

Count Three charges Mr. Jordan with interstate stalking in violation of 18 U.S.C. § 2261(A)(2). Id. According to the language of the indictment, Mr. Jordan intentionally engaged in a course of conduct that caused his former girlfriend ("Victim-1") substantial emotional distress and placed her in reasonable fear that she and members of her family would be killed or seriously injured. Id. In particular, Mr. Jordan allegedly made threatening telephone calls and sent threatening facsimiles and e-mail messages with the intent to injure, harass, intimidate, and cause substantial emotional distress to his former girlfriend. Id. This conduct allegedly occurred between December 2007 and January 11, 2008. Id.

Counts Four through Six charge Mr. Jordan with mail fraud in violation of 18 U.S.C. § 1341 and 2. Id. Specifically, the indictment charges that Mr. Jordan fraudulently obtained the personal identification information of other individuals in order to obtain credit cards, debit cards and bank accounts in their names without their knowledge or authorization. Id. In furtherance of this alleged scheme, Mr. Jordan purportedly caused three individuals (Victim-3, Victim-4, and Victim-5) to send him background check forms in either January 2007 or March 2007. Id. These background check forms were allegedly sent to one of two addresses in lower Manhattan. Id.

Count Seven charges Mr. Jordan with aggravated identity theft in violation of 18 U.S.C. § 1028A and 2. Id. In particular, the indictment claims that Mr. Jordan possessed and used the means of identities that Victims 3, 4 and 5 allegedly mailed to him. Id. According to the indictment, Mr. Jordan unlawfully used these means of identification to obtain unauthorized credit cards, debit cards and bank accounts as charged in Counts Four through Six. Id. This conduct allegedly occurred between at least 2005 and January 11, 2008. Id.

Counts Eight and Nine charge Mr. Jordan with access device fraud in violation of 18 U.S.C. § 1029(a)(5) and 2 and fraudulently possessing access devices in violation of 18 U.S.C. § 1029(a)(3) and 2. Id. In Count Eight, Mr. Jordan is charged with using credit cards, debit cards, and bank account numbers issued in the names of other individuals without their authorization to purchase goods and make withdrawals from automated teller machines. Id. Count Nine alleges that Mr. Jordan possessed at least 15 unauthorized credit cards, debit cards, and bank account numbers issued in the names of other individuals. Id. The conduct charged in these two counts allegedly occurred between at least 2005 and January 11, 2008. Id.

Count Ten charges Mr. Jordan with a second count of aggravated identity theft in violation of 18 U.S.C. § 1028A and 2. Id. Here, Mr. Jordan is accused of unlawfully possessing and using the means of identification of other individuals to obtain credit cards, debit cards, and bank account numbers. Id. Again, this conduct allegedly occurred between at least 2005 and January 11, 2008. Id.

On June 9, 2008, the government provided a bill of particulars disclosing the details of the threats that they will seek to prove at trial in relation to Counts One and Two. See Doherty Aff. ¶ 8 (citing Exhibit F). These alleged threats include statements that Mr. Jordan would "kill" Ms. Thenault, her mother, and her sister, "take [Ms. Thenault] off the planet," and "wipe all of [them] off the face of the earth." Id. The alleged threats also include statements directed at Ambassador Morean-Phillip regarding individuals with AK-47s seeking to get at her in London and advising her that unless she apologized she should be provided with increased security. Id.

## **ARGUMENT**

I.    COUNTS ONE THROUGH THREE ARE IMPROPERLY JOINED WITH COUNTS
       FOUR THROUGH TEN UNDER FED.R.CRIM.P. RULE 8(A).

Rule 8(a) of the Federal Rules of Criminal Procedure provides that "[t]he indictment or

information may charge a defendant in separate counts with 2 or more offenses if the offenses

charged – whether felonies or misdemeanors or both – are of the same or similar character, or are

based on the same act or transaction, or are connected with or constitute parts of a common

scheme or plan." Fed.R.Crim.P. 8(a).[1] Joinder is proper when the same evidence will support

each of the joined counts. See United States v. Blakney, 941 F.2d 114, 116 (2d Cir. 1991).

In this case, Counts One through Three and Counts Four through Ten cannot be said to be

of the same or similar character. The first three counts all deal with a series of threatening

communications allegedly directed at Mr. Jordan's former girlfriend, Simone Thenault ("Victim-

1"), her aunt, Glenda Morean-Phillip ("Victim-2"), and other members of her immediate family.

The remaining seven counts do not deal in any way with threatening communications or any

other kind of violent or potentially violent action. Instead, they deal with allegations of fraud –

mail fraud, aggravated identity theft, and access device fraud – purportedly committed for

financial gain. Thus, the two sets of offenses represent two entirely distinct categories of crimes.

Indeed, the Second Circuit has made clear that even offenses charged under the very same

statute can be misjoined under Rule 8(a) if the offense conduct is not sufficiently similar. In

United States v. Tobol, 191 F.3d 88 (2d Cir. 1999), for example, the Court held that two robbery

---

[1]    The Court of Appeals reviews the propriety of joinder de novo as a question of
law. See United States v. Tobol, 191 F.3d 88, 94 (2d Cir. 1999).

counts were improperly joined. The Court made this determination despite real parallels between the two offenses – namely that the robberies occurred in close geographical proximity, took place within a six-week period, and each involved the use of a gun. Id. at 94-95. The Court noted, however, that the robberies had involved different types of victims – a bank versus a small store – and the defendant had used different methods in each of the robberies. Id. at 95. Given these differences, the Court held that use of a gun and the proximity in time and place did not adequately support joinder of the counts. Id.

The two sets of offenses charged in this case, moreover, did not involve the same acts or transactions. The alleged acts involved in the first three counts all involve making threats by telephone, e-mail, and fax to harm Mr. Jordan's former girlfriend and her family. By sharp contrast, the last seven counts all allege fraudulent acts aimed at accessing other people's personal information for the purpose of obtaining credit cards, debit cards, and bank accounts in their names. Because the acts involved in each set of offenses are so dissimilar, trying them separately will not require that the government "prov[e] what is essentially the same set of facts more than once" or mandate that Mr. Jordan "defend[] more than once against what are essentially the same, or at least connected, charges." United States v. Shellef, 507 F.3d 82, 99-100 (2d Cir. 2007) (quoting United States v. Halper, 590 F.2d 422, 430 (2d Cir. 1978)); see also United States v. Myers, 700 F.Supp. 1358 (D.N.J. 1988) (theft and assault charges were misjoined as they were not based on the "same act or transaction," given that neither required proving elements of the other).

9

Finally, the two sets of offenses are not part of a common scheme or plan. In a different context, the Second Circuit has held that the factors relevant to determining whether two offenses are connected by a "common scheme or plan" include: (1) the time period within which the offenses took place; (2) the participants involved; (3) the victims targeted; (4) the motive; (5) the modus operandi; (6) the geographic location of the crimes; (7) the substantive offenses committed; (8) whether the acts were uncovered by a common investigation; and (9) whether the offenses were jointly planned. See United States v. Brothers, 316 F.3d 120, 123-24 (2d Cir. 2003) (defining "common scheme or plan" for the purposes of the Career Offender Guideline). The Second Circuit has also made clear that simply because certain aspects of one set of offenses might be relevant in establishing an element of the other set of offenses is not sufficient to justify joinder. See Shellef, 507 F.3d at 100.

In this case, the factors laid out in Brothers strongly counsel against the appropriateness of joinder. As noted, the alleged acts of the three threat counts are of an entirely different character than the alleged acts of the seven fraud counts. The threat and fraud counts also involve separate and distinct sets of victims, who do not reside in the same geographic location.[2] The threats, moreover, allegedly occurred over a relatively brief time-period, from December 2007 to January 11, 2008, immediately after the break-up of a romantic relationship. The fraud offenses, meanwhile, allegedly occurred over the course of a three-year period, dating back to

---

[2]    The defense understands that Ms. Thenault and her family are the alleged victims of Counts One through Three. We also understand that the alleged victims of the fraud offenses − Patrick Jordan, Douglas Fidler, Joseph Landa, Jason Kaufman, and Matthew McGlasson − are not related to Ms. Thenault.

2005. Thus, the two sets of offenses cannot be said to have been jointly planned. With regard to

motive, the defense does not understand there to be any allegation that the threats charged in the

first three counts were made to further the fraud alleged in Counts Four through Ten. Similarly,

the acts of mail fraud, aggravated identity theft, and access device fraud are not alleged to have

been committed in order to perpetuate the threats against Ms. Thenault and her family.

In sum, charging the threat and fraud offenses in the same indictment was improper

because the offenses are not similar in character, do not involve the same acts or transactions,

and were not part of a common scheme or plan. The defense therefore respectfully requests that

the Court determine that the offenses were improperly joined.

II.    COUNTS ONE THROUGH THREE SHOULD BE SEVERED FROM COUNTS FOUR
       THROUGH TEN UNDER FED.R.CRIM.P. RULE 14(A).

If Your Honor declines to find that Counts Four through Ten were improperly joined with

Counts One through Three, the defense requests in the alternative that the Court sever the threat

and fraud counts under Rule 14(a) of the Federal Rules of Criminal Procedure.[3] Fed.R.Crim.P.

14(a). In particular, Rule 14(a) provides:

> If the joinder of offenses or defendants in an indictment, an information, or a
> consolidation for trial appears to prejudice a defendant or the government, the court may
> order separate trials of counts, sever the defendants' trials, or provide any other relief that
> justice requires.

Fed.R.Crim.P. 14(a). Counts should be severed under this rule when their joinder causes the

---

[3]    The decision to grant or deny a severance motion is "committed to the sound
discretion of the trial judge." United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989).
"The primary concern in weighing the prejudice of joinder against its benefits is the wise
conservation of judicial resources." United States v. Desantis, 802 F.Supp. 794, 802 (E.D.N.Y.
1992).

11

defendant "substantial prejudice." United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004) (finding prejudicial joinder of two sets of narcotics counts, which alleged activities occurring two years apart, necessitating a new trial).

In this case, Mr. Jordan stands to suffer substantial prejudice if Counts One through Three are tried together with Counts Four through Ten. Mr. Jordan's right to a fair trial on the fraud counts would be obliterated if these seven counts are tried together with the threat counts. The evidence in the threat counts will concern whether Mr. Jordan threatened to kidnap, harm, and/or kill Ms. Thenault, her aunt (an Ambassador from Trinidad and Tobago), and other members of her immediate family. On June 9, 2008, moreover, the government provided a bill of particulars disclosing the details of the threats that they will seek to prove at trial. See Doherty Aff. ¶ 8 (citing Exhibit F). The alleged threats include statements that Mr. Jordan would "kill" Ms. Thenault, her mother, and her sister, "take [Ms. Thenault] off the planet," and "wipe all of [them] off the face of the earth." Id. The alleged threats also include statements directed at Ambassador Morean-Phillip regarding individuals with AK-47s seeking to get at her in London and advising her that unless she apologized she should be provided with increased security. Id.

The highly fraught language of the threat counts – which speak in terms of harassing, stalking, intimidating, kidnaping, threatening bodily injury and death, and the use of violence and physical force – is by itself sufficient to cause spill-over prejudice to Mr. Jordan on the fraud counts. This prejudice will only be enhanced by the explosive nature of the evidence that the government intends to introduce at trial about the content of the alleged threats. In this context, the jury will not be able to put aside the evidence about the threats in deciding whether the

12

government has met its burden in establishing that Mr. Jordan is separately guilty of mail fraud, identity theft, and access device fraud. There is a significant risk that if members of the jury credit (in any way) the government's evidence about these threats, they will not hold the government to the burden of proof on the fraud counts. Members of the jury may conclude that someone who is capable of threatening physical force against an intimate partner and her family is certainly someone who is capable of using other people's identities to obtain access to debit cards, credit cards, and bank accounts.

Granting Mr. Jordan's motion for severance would not unnecessarily strain the resources of the Court. The elements and proof in the three threat counts and the seven fraud counts do not overlap in any significant way. Different witnesses would need to be called with respect to each set of counts. Accordingly, severing the threat and fraud counts would not unduly lengthen the time it will take to try the ten counts charged in this case. We therefore respectfully urge the Court to find that the importance of a fair trial on both sets of counts outweighs any countervailing considerations of judicial economy.

III.    THE EVIDENCE AND DOCUMENTS SEIZED FROM MR. JORDAN AFTER HIS JANUARY 11, 2008 AND MARCH 3, 2008 ARRESTS MUST BE SUPPRESSED.

   A.    **Inventory Searches Must Follow a Standardized Procedure and Cannot Be Used as a Pretext to Search for Inculpatory Evidence.**

Ordinarily, for a search to be reasonable under the Fourth Amendment, it must be conducted pursuant to a search warrant. An inventory search, however, constitutes an exception to the warrant requirement. The Supreme Court has held that police officers may search the "personal effects of a person under arrest as part of the routine administrative procedure at a

13

police station house incident to booking and jailing the suspect." Illinois v. Lafayette, 462 U.S.

640, 643 (1983). In so holding, the Court explained that a "so-called inventory search" is an

administrative step "following arrest and preceding incarceration." Id. at 644. "At the station

house, it is entirely proper for police to remove and list or inventory property found on the person

or in the possession of an arrested person who is to be jailed." Id. at 646. The rationale behind

the inventory search exception is the need to protect property while it is in police custody, to

protect the police from claims over lost or stolen property, and to protect the police from

potential danger. See Colorado v. Bertine, 479 U.S. 367, 372 (1987).

     While inventory searches do not need to be supported by probable cause, they are only

permissible under the Fourth Amendment when they are conducted pursuant to "established

inventory procedures." Lafayette, 462 U.S. at 648; see also United States v. Gorski, 852 F.2d

692, 696 (2d Cir. 1998) (remanding for an evidentiary hearing on whether inventory search of

bag "was a routine procedure incident to booking and detention of a suspect at the FBI office in

question"); United States v. Santos, 961 F.Supp. 71, 72 (S.D.N.Y. 1997) ("While there is no need

for the government to have probable cause before conducting an inventory search, protections

against arbitrary exercises of police power are afforded by the requirement that inventory

searches be conducted pursuant to a standardized or routine practice."). Accordingly, if

authorized by the applicable, standardized procedures, an officer may search a container or

examine written material in the course of an inventory search. See United States v. Griffiths, 47

F.3d 74, 78 (2d Cir. 1995). The Supreme Court has made clear, however, that "an inventory

search must not be a ruse for a general rummaging in order to discover incriminating evidence."

Florida v. Wells, 495 U.S. 1, 4 (1990). Police officers may not be allowed so much discretion that inventory searches become "a purposeful and general means of discovering evidence of a crime." Bertine, 479 U.S. at 376. "Thus, the government may not conduct a search of an arrestee's property to discover inculpatory evidence in the guise of an inventory search." Santos, 961 F.Supp. at 72; United States v. Palacios, 957 F.Supp. 50, 53 (S.D.N.Y. 1997) ("The standardized procedures must be consistent with the limited caretaking, non-investigative purposes for which inventory searches are allowed.")

In Santos, for example, Judge Scheindlin determined that an FBI agent's search of an arrestee's property was not properly conducted pursuant to an established inventory procedure, but was instead conducted for the purpose of finding evidence of criminal activity. 961 F.Supp. at 73-74. This was in part because the agent took seven days to complete the inventory of three duffel bags and prepared a six-page inventory with every piece of written material "painstaking reviewed and described." Id. at 74. The vast majority of the items were then retained as evidence. Id. Based on this record, Judge Scheindlin determined that the purpose of the agent's inventory was not the "caretaking" function permitted by the caselaw, but instead the inventory "provided a pretext for a full and detailed search of all of the defendant's belongings for the explicit purpose of uncovering evidence and thus violated defendant's rights under the Fourth Amendment." Id. The court further found that even if the agent had not impermissibly used the inventory search as a pretext for a warrantless investigation, the agent's actions went far beyond what is necessary to prepare an inventory of a defendant's personal items:

> The distinguishing feature of Agent Meehan's search was that she read all the written material that she found among defendant's possessions. She did so not because her eye

15

> happened to fall upon clearly printed words on the face of inventoried items, or because she was attempting to determine the nature of an object to be inventoried. Rather it is apparent that Agent Meehan read defendant's books and letters in order to discover incriminating evidence. This affirmative, investigatory act overstepped the limits of the inventory search exception permitted by current Fourth Amendment caselaw.

Id. In granting the defendant's motion to suppress the evidence seized during the inventory search, the court emphasized that there is "no reason" why government officials must read written material in order to inventory an arrestee's belongings and that "the Fourth Amendment requires that they obtain a warrant before doing so." Id. at 75.

In a separate case, involving the transfer of prisoners from state to federal custody, Judge Cedarbaum likewise found that FBI agents had overstepped the permissible bounds of an inventory search. See Palacios, 957 F.Supp. at 54. In suppressing the evidence seized from these searches, the court faulted the agents for "read[ing] all the letters and documents from beginning to end and look[ing] at all the items as carefully as they pleased." Id. The court emphasized that "[s]uch broad discretion to search generally and thoroughly is exactly what courts have tried to proscribe in requiring standardized procedures for inventory searches." Id. The government had argued that it was appropriate for the FBI agents to read through the defendants' letters and documents to protect the general public from danger, as one of the agents was conscious that some members of the Latin Kings had communicated death orders from their jail cells (and the defendants were alleged to be members). Id. at 55. The court dismissed this argument out of hand, making clear that "[i]f there was probable cause to believe that some of [the defendants'] letters contained death orders, [the agent] should have obtained a search warrant. An inventory search cannot be used as a substitute for obtaining a warrant." Id.

16

**B.    The Search of Mr. Jordan's Property Following His January 11, 2008 Arrest Was Improper.**

In Mr. Jordan's case, it is clear that (as in <u>Santos</u> and <u>Palacios</u>) the arresting authorities impermissibly used supposed "inventory searches" as a pretext for looking for evidence against him.  Following his original January 11, 2008 arrest, the arresting officers seized Mr. Jordan's personal possessions, including his wallet and a detailed affidavit that he had prepared to rebut a claim that he had threatened Ms. Thenault's mother.  <u>See</u> Doherty Aff. ¶ 3 (citing Exhibit B).  After his arrest, Mr. Jordan was brought into New York State custody, where he remained until he was transferred to federal custody on March 3, 2008.  <u>Id.</u> ¶¶ 3, 6 (citing Exhibits C and E).

According to the FBI, a "routine inventory search" of Mr. Jordan's wallet was conducted on February 6, 2008.[4]  <u>Id.</u> ¶ 4.  In searching through Mr. Jordan's wallet, the officers recovered a "business card of a car service company that contained a handwritten note listing the address" of a building, located at 2773 Reservoir Avenue, Bronx, New York, 10468 (the "Building").  <u>Id.</u> (citing Exhibit D).  This was helpful to the officers, as Mr. Jordan had declined to provide his address at the time of his arrest.  <u>Id.</u> ¶ 3.  That same day, February 6, 2008, two NYPD detectives "traveled to the Building to determine if the Building contained Jordan's residence."  <u>Id.</u> ¶ 4 (citing Exhibit A ¶ 11).  The NYPD detectives interviewed a resident of the Building, who recognized a picture of Mr. Jordan and confirmed that Mr. Jordan lived on the second floor of the Building.  <u>Id.</u>  The next day, one of the NYPD detectives returned to the Building with Special Agent Brandon Waller of the FBI.  <u>Id.</u> (citing Exhibit A ¶ 12).  The two officers interviewed the

---

[4]    It is not clear from the information currently available to the defense, who performed the inventory search, who directed that it be done, or what procedures were used.

residents of the Building, examined the common areas of the premises, and inspected materials

and boxes that they believed belonged to Mr. Jordan. Id. This information was then used to seek

a federal search warrant of the second floor of the Building, which was issued by Judge Eaton on

February 8, 2008. Id. (citing Exhibit A at p. 1).

Other material was also allegedly recovered during the search of Mr. Jordan's wallet. Id.

¶ 5. Additional materials found in the wallet (and referenced in the search warrant application)

included a bank debit card in the name of "Joseph Landa" and a card with Mr. Jordan's cell

phone provider and the following language: "DF last 4: 6522." Id. (citing Exhibit A ¶ 17). Other

items seized from the wallet included access devices in the name of Patrick Jordan, bank records,

receipts, business cards, and listings of contact details and telephone numbers. Id.

The circumstances of this purported "inventory search" reveal that it was conducted for

investigative purposes. As a preliminary matter, it is hard to understand why the search was not

conducted until February 6, 2008, nearly a month after Mr. Jordan had been taken into state

custody. In authorizing the inventory search exception to the warrant requirement, the Supreme

Court contemplated that the search would take place at the station house before the defendant

was jailed. See Lafayette, 462 U.S. at 655, 646. Waiting almost a month to conduct the

inventory search would seem contrary to the whole rationale behind the exception – protecting

property while it is in police custody, protecting the police from claims over lost or stolen

property, and protecting the police from potential danger. See Bertine, 479 U.S. at 372.

When the inventory search was finally performed, moreover, the agents carefully read

though all of the cards in Mr. Jordan's wallet, making special note of a hand-written address

18

scrawled on a business card for a car service company. <u>See</u> Doherty Aff. ¶ 4 (citing Exhibit D). Seizing on this information, as Mr. Jordan had not provided his residence address, two NYPD detectives went out to the Building that very same day to see what they could find against Mr. Jordan. One of the officers returned the next day with Agent Waller to seek additional evidence. The FBI then used this evidence – obtained as a direct result of the improper "inventory search" – as a basis for seeking a federal search warrant of the Building.

  The fact that the law enforcement authorities unlawfully read through the items in the wallet – in order to find leads against Mr. Jordan – is clear from their actions in the immediate aftermath of the "inventory search." The fact that the authorities viewed this "inventory search" as investigatory is also evident from the fact that the materials from the wallet were at some point turned over to the United States Attorney's office as evidence to be used against Mr. Jordan. The affidavit seized from Mr. Jordan during his January 11, 2008 arrest was also read and considered by the officers. This affidavit was similarly provided to the United States Attorney's Office, which has disclosed it to the defense in discovery. As in <u>Palacios</u> and <u>Santos</u>, the agents' actions in reading through Mr. Jordan's documents and property cannot be justified under the Fourth Amendment.

  Accordingly, the evidence seized from Mr. Jordan following his January 11, 2008 arrest must be suppressed. In addition, all of the evidence discovered as a result of the improper "inventory search" of the wallet and the officers' review of the affidavit should be suppressed as fruit of the poisonous tree. <u>See, e.g.</u>, <u>United States v. Calandra</u>, 414 U.S. 338, 347 (1974) (explaining that the exclusionary rule provides that "evidence obtained in violation of the Fourth

Amendment['s]" protection against unreasonable searches and seizures "cannot be used in a

criminal proceeding against the victim of the illegal search and seizure"); Segura v. United

States, 468 U.S. 796, 804 (1984) (emphasizing that the exclusionary rule "reaches not only

primary evidence obtained as a direct result of the illegal search and seizure", "but also evidence

later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree'" and

"'extends as well to the indirect as well as the direct products' of unconstitutional conduct"). In

the alternative, the defense respectfully requests that the Court grant an evidentiary hearing to

inquire further into the circumstances of the seizure of Mr. Jordan's property on January 11, 2008

and the facts surrounding what was done with this property, including any and all "inventory

searches" conducted by the authorities.

C.    **The Search of Mr. Jordan's Property Following His March 3, 2008 Transfer
      to Federal Custody Was Improper.**

On March 3, 2008, Mr. Jordan was arrested at Riker's Island by Special Agent Waller and

Detective Paul Courtney pursuant to a three-count indictment obtained in the Southern District of

New York on February 14, 2008. See Doherty Aff. ¶ 6 (citing Exhibit E). Mr. Jordan was then

brought to the FBI offices at 26 Federal Plaza for processing and to be interviewed. Id.

Subsequent to his March 3, 2008 arrest, documents were also seized from his possession. Id.

These documents, which were provided to the defense in discovery, included materials that Mr.

Jordan had prepared regarding allegations that he had threatened Ms. Thenault, her mother, and

her aunt (Ambassador Morean-Phillip). Id. The documents seized on March 3, 2008 also

included materials such as Mr. Jordan's hand-written notes, the contact details for his friends,

family and potential witnesses in his case, and a letter written to a friend. Id.

20

At this point, it is unclear why the agents believed that they were entitled to read through all of the documents in Mr. Jordan's possession, especially as these materials included documents directly related to the pending federal and state charges against him. The agents' actions in seizing and reading the documents is all the more troubling considering that Mr. Jordan had already been appointed counsel in his state case and at least some of the documents might well have been protected by attorney-client privilege. Nevertheless, it is apparent that the agents did indeed read through these documents and then provided them to the United States Attorney's office to be used as evidence against Mr. Jordan.

Because the agents acted improperly in reading the documents, the material seized from Mr. Jordan on March 3, 2008 should be suppressed. Any evidence obtained derivatively as a result of the agent's review of the documents should also be suppressed as fruit of the poisonous tree. See Calandra, 414 U.S. at 347; Segura, 468 U.S. at 804. In the alternative, the defense respectfully requests an evidentiary hearing to investigate the circumstances behind the seizure of Mr. Jordan's property on March 3, 2008 and the agents' review of this material.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests that the Court determine that the threat and fraud counts were improperly joined in the indictment under Rule 8(a) of the Federal Rules of Criminal Procedure. In the alternative, the defense requests that the Court sever the threat and fraud counts under Rule 14(a) of the Federal Rules of Criminal Procedure. The defense also respectfully requests that the Court suppress the materials seized from Mr. Jordan subsequent to his January 11, 2008 and March 3, 2008 arrests.

Dated:   New York, New York
         June 13, 2008

                          LEONARD F. JOY, ESQ.
                          Federal Defenders of New York, Inc.
                          Attorney for Defendant
                          **JOSEPH JORDAN**
                          52 Duane Street - 10th Floor
                          New York, New York  10007
                          Tel.: (212) 417-8734

                          *Fiona Doherty*
                          **FIONA DOHERTY, ESQ.**
                          Of Counsel

TO:    MICHAEL J. GARCIA, ESQ.
       United States Attorney
       Southern District of New York
       One Saint Andrew's Plaza
       New York, New York 10007
       Attn: **HOWARD MASTER, ESQ.**
             Assistant United States Attorney

22