

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

June 25, 2008

**CORRECTED**
**BY HAND**

Hon. Denise L. Cote
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street, Room 1050
New York, New York 10007

Re:    *United States v. Joseph Ray Jordan*,
       S1 08 Cr.124 (DLC)

Dear Judge Cote:

       The Government respectfully submits this corrected letter in response to the pretrial motions submitted by Joseph Ray Jordan, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant.  In his motion papers, the defendant argues that: (1) the first two counts of the operative superseding indictment in this matter, filed on May 1, 2008 (hereinafter, the "Indictment"),[1] charging the defendant with violations of Title 18, United States Code, Sections 875(c) and 878, should be dismissed, or that in the alternative, the Government should be ordered to provide the defendant with a bill of particulars; (2) the Court should issue an order severing Counts One through Three of the Indictment, which charge threatening and stalking conduct (collectively, the "Threat Counts"), from Counts Four through Ten, which charge fraud and identity theft-related offenses (collectively, the "Fraud Counts"), under Fed. R. Crim. P. 8(a) or 14(a); (3) the defendant's statements to agents of the Federal Bureau of Investigation ("FBI") following his initial arrest on January 11, 2008 on a warrant for unlawful flight to avoid prosecution, in violation of Title 18, United States Code, Section 1073, should be suppressed; and (4) documents and other materials seized incident to the defendant's January 11, 2008 arrest and his arrest on March 3, 2008 on the initial Indictment filed in this Court should be suppressed.

       The defendant's arguments are without merit.  The allegations set forth in Counts One and Two of the Indictment are more than sufficient to survive a motion to dismiss, and his

---

[1]        A copy of the Indictment is attached hereto as Exhibit A.

Hon. Denise L. Cote
June 25, 2008
Page 2 of 15

motion for a bill of particulars is rendered moot by the Government's decision to file a bill of particulars (the "Bill of Particulars")[2] setting forth numerous "true threats" to the defendant's ex-girlfriend ("Victim-1"), Victim-1's aunt ("Victim-2"), who at the time of the events charged in the Indictment was the ambassador of a foreign nation to the United Kingdom and to several other European nations, and other members of Victim-1's family. The defendant's motion to sever the Threat Counts from the Fraud Counts should be denied. Joinder is proper under Rule 8(a) because the defendant's fraudulent scheme to steal individuals' identities charged in the Fraud Counts, and the unauthorized access devices that he obtained as a result of those crimes, were used to facilitate and evade detection of his threatening and stalking conduct charged in the Threat Counts. Moreover, a substantial portion of the evidence that would be introduced at a trial on the Threat Counts would also be admissible in a trial on the Fraud Counts. Severance is not warranted under Rule 14 because any prejudice suffered by the defendant is outweighed by the efficiency and other benefits associated with trying the defendant in a single trial.

Because resolution of the defendant's motions to suppress may depend on factual determinations by the Court, the Government consents to a suppression hearing addressing the defendant's motions to suppress certain post-arrest statements and items seized incident to his arrests.

## BACKGROUND

### A.    The Defendant's Criminal Conduct

The Threat Counts arise out of the defendant's efforts to threaten, intimidate, and harass Victim-1 and her family members, including Victim-2. The Government expects that the evidence introduced at trial will show that the defendant began to sexually, physically, and mentally abuse Victim-1 soon after they become romantically involved in mid-2007. In December 2007, Victim-1 fled to her sister's home in Virginia in order to escape from the defendant. The defendant then began sending threatening communications to Victim-1 and her family members in Virginia, in which he threatened to kill or injure them, and engaged in a course of conduct that caused Victim-1 substantial emotional distress and led her to fear that the defendant would travel to Virginia to kill her and her family members. Later in December, Victim-1 fled to the United Kingdom to stay at the official residence of her aunt, Victim-2, in order to escape and hide from the defendant. After the defendant discovered that Victim-1 had fled to England to stay at Victim-2's official residence, the defendant made phone calls and sent facsimiles to the Victim-2's Embassy, to Victim-2's official residence, and to embassies and media outlets around the world, that included, *inter alia*, threats to kidnap Victim-1, to attack Victim-2's official residence, and to kill, seize or injure Victim-2.

---

[2]        A copy of the Bill of Particulars is attached hereto as Exhibit B.

Hon. Denise L. Cote
June 25, 2008
Page 3 of 15

The Fraud Counts arise out of the defendant's efforts to illegally obtain the personal identification information of victims through a fraudulent scheme and through other means, and to use that information to obtain credit cards, debit cards and bank accounts in the names of those individuals without their knowledge or authorization. The Government expects that the evidence introduced at trial will show that the fraudulent scheme involves a bogus charitable organization named "Caring Pals" that the defendant created, and that purported to help children. Victims who expressed interest in serving as "representatives" for the organization were told to submit their personal identification information in order to be qualified to work for Caring Pals. In fact, the organization provided no charitable services, and served primarily as a vehicle for the defendant to obtain victims' personal identification information for later illegal and unauthorized use.  The defendant also obtained victims' personal identification information through other means and used that information to obtain credit cards, debit cards and bank accounts in the names of those individuals without their authorization.

### B.      The Indictment

 On February 14, 2008, a grand jury returned a three-count indictment charging the defendant with transmitting in interstate and foreign commerce threats to kidnap and injure Victim-1, Victim-2, and other members of Victim-1's immediate family, in violation of Title 18, United States Code, Section 875(c); threatening to assault, seize, confine, and attack the private accomodation of Victim-2, in violation of Title 18, United States Code, Section 878; and interstate stalking, in violation of Title 18, United States Code, Section 2261A(2).

A grand jury returned the Indictment on May 1, 2008.  The Indictment retains Counts One through Three of the original indictment and adds seven charges related to the defendant's scheme to fraudulently obtain the personal identification information of other individuals, and his obtaining of unauthorized access devices through that fraudulent scheme and by other means. Counts Four through Six charge the defendant with mail fraud in connection with the fraudulent scheme, in violation of Title 18, United States Code, Section 1341; Count Seven charges the defendant with aggravated identity theft in connection with the fraudulent scheme charged in Counts Four through Six, in violation of Title 18, United States Code, Sections 1028A and 2; Counts Eight and Nine charge the defendant with possession and fraudulent use of unauthorized access devices, in violation of Title 18, United States Code, Sections 1029(a)(3), 1029(a)(5), and 2; and Count Ten charges the defendant with aggravated identity theft in connection with the access device frauds charged in Counts Eight and Nine, in violation of Title 18, United States Code, Sections 1028A and 2.

### C.      Discovery and Bill of Particulars

Hon. Denise L. Cote
June 25, 2008
Page 4 of 15

The Government has provided extensive documentary discovery to the defendant, has provided copies of electronic evidence to the defendant, and has made available for inspection documents and other physical evidence obtained by the Government, including evidence seized from the defendant incident to his January 11 and March 3, 2008 arrests, and seized pursuant to a search warrant of the defendant's residence that was executed on or about February 8, 2008. Moreover, in response to the defendant's request for a bill of particulars setting forth the content of threats charged in Counts One and Two, the Government provided the Bill of Particulars to the defendant on or about June 9, 2008 in which it provided the requested information. The Government has also had multiple telephonic discussions with defense counsel regarding the discovery that has been produced, and how it corresponds to the charges in the Indictment.

## ARGUMENT

**A.    The Motion to Dismiss Counts One and Two Should be Denied**

1.    <u>Applicable Law</u>

On a pre-trial motion to dismiss pursuant to Fed R. Crim. 12(b), the allegations of the indictment must be taken as true. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). The law is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 365 (1956). A defendant must wait until after the close of the Government's case-in-chief at trial or after the jury's verdict before contesting the sufficiency of the evidence. *See* Fed. R. Crim. P. 29; *see also United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997); *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992).

Rule 7(c) of the Federal Rules of Criminal Procedure, which governs the type of information that must be contained in an indictment, provides that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim P. 7(c). Thus, "[t]he Federal Rules of Criminal Procedure encourage succinct criminal pleadings." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). To satisfy the pleading requirements of Fed. R. Crim. P. 7(c), "'an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (*quoting Stavroulakis*, 952 F.2d at 693). Moreover, an indictment "'must be read to include facts which are necessarily implied by the specific allegations made.'" *Id.* (quoting *Stavroulakis*, 952 F.2d at 693). Accordingly, "when an indictment delineates the elements of a charged offense, however concisely, the underlying concerns of proper pleading—notice of the charge to be met and protection against double jeopardy—may be further promoted by a bill of particulars or

Hon. Denise L. Cote
June 25, 2008
Page 5 of 15

pre-trial discovery." *Stavroulakis*, 952 F.2d at 693 (citing *United States v. McClean*, 528 F.2d 1250, 1257 (2d Cir.1976)).

      2.   <u>Discussion</u>

      Counts One and Two sufficiently allege violations of the relevant statutes.   Count One alleges that the defendant violated 18 U.S.C. § 875(c), which provides that "[w]hoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be [guilty of a crime]." 18 U.S.C. § 875(c). Count One alleges that the defendant violated this statute "in the Southern District of New York and elsewhere" during a specific period—December 2007, up to and including January 11, 2008—and that he did so during that period when he "made telephone calls, and sent e-mails and facsimiles, in which [he] threatened to kidnap his former girlfriend ("Victim-1"), and to injure the person of Victim-1, Victim-1's aunt, and other members of Victim-1's immediate family." (Indictment ¶ 1.)  The charge also sets forth relevant statutory language and alleges that the defendant transmitted the threatening communications "unlawfully, willingly, and knowingly." (*Id.*)

      Count Two alleges that the defendant violated 18 U.S.C. § 878, which provides that "[w]hoever knowingly and willfully threatens to violate [Title 18,] section[s] 112, 1116, or 1201 shall be [guilty of a crime]."  Count Two alleges that the defendant violated Section 878 by threatening to violate 18 U.S.C. § 112(a), which provides for punishment for an individual who "assaults, strikes, wounds, imprisons, or offers violence to a[n] . . . internationally protected person or makes any other violent attack upon the person or liberty of such person, or, if likely to endanger his person or liberty, makes a violent attack upon his official premises, private accommodation, or means of transport," and 18 U.S.C. § 1201(a)(4), which provides for punishment for an individual who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise . . . an internationally protected person . . . ."[3]  As with Count One, Count Two alleges that the defendant violated

---

      [3]      The term "internationally protected person" is defined by 18 U.S.C. § 1116(b)(4). The term includes, in relevant part, "any . . . representative, officer, employee, or agent of the United States Government, a foreign government, or international organization who at the time and place concerned is entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity, and any member of his family then forming part of his household."  Ambassadors are among those entitled to protection under this provision, which was adopted pursuant to the Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents ("New York Convention"), Dec. 14, 1973, 28 U.S.T. 1975, T.I.A.S. No. 8532.  *See United States v. Gan*, 636 F.2d 28, 29-30 (2d Cir. 1980) (per curiam) (affirming conviction for assaulting internationally protected person, in violation of 18 U.S.C. § 112(a), on basis of attack on United States ambassador at United

Hon. Denise L. Cote
June 25, 2008
Page 6 of 15

Section 878 "in the Southern District of New York and elsewhere" during a specific
period—December 2007, up to and including January 11, 2008—and that he did so through
using specific methods—by "ma[king] telephone calls, and sen[ding] e-mails and facsimiles, in
which [the defendant] threatened to attack the residence of Victim-2, who is an internationally
protected person, and to seize and harm Victim-2 if Victim-2 resisted [the defendant's] efforts to
kidnap Victim-1."  (Indictment ¶ 2.)  Also as with Count One, the charge also sets forth relevant
statutory language and alleges that the defendant made these threats "unlawfully, willingly, and
knowingly." (*Id.*)

        These allegations easily satisfy the pleading requirements set forth in *LaSpina* and
*Stavroulakis*.  Each count "track[s] the language of the statute charged and state[s] the time and
place (in approximate terms) of the alleged crime." *LaSpina*, 299 F.3d at 177 (quoting
*Stavroulakis*, 952 F.2d at 693).  Moreover, each count, particularly when "read to include facts
which are necessarily implied by the specific allegations made," *id.* (quoting *Stavroulakis*, 952
F.2d at 693), alleges conduct that violates the relevant statutes.  Count One alleges that the
defendant transmitted in interstate and foreign commerce threats to kidnap and injure others;
such threats are specifically criminalized by Section 875.  Count Two alleges that the defendant
threatened to seize, harm, and attack the residence of an internationally-protected person; such
threats are specifically criminalized by Section 878.

        The defendant alleges that as a result of the purported flaws in Counts One and Two, the
defendant lacks "sufficient notice of the particular offenses with which he has been charged."
(Def. Mot. to Dismiss 7.)  This argument is without merit.  The defendant's concerns about
notice, to the extent that they are not already obviated by the Indictment itself, were fully
addressed by the provision of discovery and the Bill of Particulars setting forth the exact
language of  threats alleged to have violated Sections 875 and 878.  *See Stavroulakis*, 952 F.2d at
693.  The Government's Bill of Particulars clearly demonstrates that the defendant has been
provided with ample notice of the charges against him.

        The defendant also argues that Counts One and Two should be dismissed because they
"fail[] to sufficiently allege that [the defendant's] statements constituted 'true threats' within the
meaning of Second Circuit case law."[4]  (Mot. to Dismiss 6.)  This challenge also fails.  The

_____

Nations); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 807 (D.C. Cir. 1984) (noting that the
New York Convention prohibits "attacks on internationally protected persons such as
diplomats").

        [4]        A "true threat" is defined by the Second Circuit as a threat that "on its face and in
the circumstances in which it is made is so unequivocal, unconditional, immediate and specific
as to the person threatened, as to convey a gravity of purpose and imminent prospect of
execution." *See United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997) (quoting *United States*

Hon. Denise L. Cote
June 25, 2008
Page 7 of 15

determination of whether a given communication constitutes a "true threat" is a fact-intensive one requiring consideration of "the circumstances in which it was made," *Kelner*, 534 F.2d at 1027, among other factors. Thus, "[w]hether a given writing constitutes a threat is an issue of fact for the trial jury. An absence of explicitly threatening language does not preclude the finding of a threat." *United States v. Malik,* 16 F.3d 45, 51 (2d Cir. 1994). As explained in *Malik*, "[t]he test is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury. In making this determination, proof of the effect of the alleged threat upon the addressee is highly relevant." *Id.* (internal citations and quotation marks omitted); *see also United States v. Davila*, 461 F.3d 298, 304-05 (2d Cir. 2006).[5] Arguments over whether a particular communication was sufficiently threatening to satisfy the Second Circuit's "true threat" test thus cannot be resolved on a motion to dismiss; rather, they must await the admission of evidence concerning the nature and circumstances of the threat and be resolved on a challenge to the sufficiency of the Government's evidence at trial. *See, e.g., Malik*, 16 F.3d at 49 (addressing arguments that communications did not constitute "true threats" as challenge to sufficiency of the evidence); *Sovie*, 122 F.3d at 125; *Davila*, 461 F.3d at 304-05 (same). This challenge must await the close of the Government's case-in-chief at trial or [occur] after the jury's verdict. *See* Fed. R. Crim. P. 29; *United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997).[6]

In any event, Counts One and Two specifically allege that the defendant unlawfully, willingly, and knowingly made threats to kidnap, injure, attack, seize, and harm his ex-girlfriend and members of her family. These allegations are more than sufficient to satisfy the requirement that the defendant communicated true threats to the recipients of the threatening communications.

---

*v. Kelner*, 534 F.2d 1020, 1027 (2d Cir.1976)).

[5]     While the question of whether a communication is protected by the First Amendment raises a question of law, *United States v. Francis*, 164 F.3d 120, 123 n.4 (2d Cir. 1999), "[a]bsent . . . an unusual set of facts, . . . existence *vel non* of a 'true threat' is a question generally best left to a jury." *Malik,* 16 F.3d at 51.

[6]     The defendant cites *United States v. Francis*, 975 F. Supp. 288 (S.D.N.Y. 1997), *rev'd*, 164 F.3d 120 (2d Cir. 1999), in support of the argument that the indictment itself must allege a "true threat." That decision's analysis of the pleading requirements applicable to a Section 875(c) violation was rejected by the Second Circuit and has no persuasive weight. In addition, that decision had no occasion to consider whether an indictment that did not set forth the language of the specific communications in the charges themselves would nonetheless be sufficient to withstand a motion to dismiss.

Hon. Denise L. Cote
June 25, 2008
Page 8 of 15

As set forth above, the defendant's motion in the alternative for a bill of particulars on Counts One and Two has been rendered moot by the Government's voluntary provision of the Bill of Particulars.

**B.    The Threat Counts and the Fraud Counts are Properly Joined and Should Not be Severed**

1.    <u>Applicable Law</u>

The defendant has moved to sever the Threat Counts (Counts One through Three) from the Fraud Counts (Counts Four through Ten) pursuant to Fed. R. Crim. P. 8(a) and 14.  Rule 8(a), the rule addressing joinder of offenses, states that a defendant may be charged "in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Rule 8(a) "necessarily recognizes the adverse effect on the defendant by a joinder of counts, but considers this to be outweighed by gains in trial economy when one of the criteria of the rule are met."  *United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980). Under Rule 8(a), "[j]oinder is proper where the same evidence may be used to prove each count."  *United States v. Blackney*, 941 F.2d 114, 116 (2d Cir. 1994); *see also United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990) (while joinder requires a "sufficient logical connection" among the crimes, precise identity among the crimes is not required for them  be properly joined); *United States v. Feola*, 651 F. Supp. 1068, 1121 (S.D.N.Y. 1987) (finding joinder of weapons and narcotics charges proper where both items were found during same search of defendant's property), *cited with approval by Blackney*, 941 F.2d at 116, *aff'd mem.*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834 (1989).

Moreover, where evidence of crimes sought to be severed would be admissible at a trial on the remaining offenses, joinder of all of the crimes is proper.  *See United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) (finding joinder of gun and robbery charges proper where "the government was entitled to offer evidence that [the defendant] had a gun when arrested to show that he had the means to commit the robberies"); *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994) (holding joinder of gun charge with RICO, loansharking and murder charges propr because "the disputed element of knowing possession [of the gun] was interconnected and overlapping with the evidence offered to prove the RICO, loansharking, and murder counts"); *Feola*, 651 F. Supp. at 1120 (approving joinder of firearms and narcotics charges in part because "evidence of firearms possession is admissible in a narcotics trial").

For crimes to be of the same or similar character, it is not necessary for there to be complete identity of the crimes charged; "[r]equiring too precise an identity between the character of the offenses would fail to give effect to the word 'similar' succeeding the word 'same' and thus violate an elementary rule of statutory construction."  *Werner*, 620 F.2d at 926.

Hon. Denise L. Cote
June 25, 2008
Page 9 of 15

Acts that are similar in character are "corresponding; resembling in many respects; somewhat alike; having a general likeness." *Id.* (quoting Webster's New International Dictionary (2d ed.)).

Crimes may also be part of a common scheme or plan where charges have a "sufficient logical connection to warrant joinder in a single trial." *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990); *see also United States v. Golomb*, 754 F.2d 86, 88 (2d Cir. 1985) (affirming joinder of mail fraud and receipt of stolen property counts, even though the counts "encompassed conduct different from" each other, where the defendant "assisted the fraud in return for his confederates' agreement to continue supplying stolen property").

The defendant also argues that severance is necessary under Rule 14(a), which authorizes severance where "the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government." If joinder is proper under Rule 8, however, a defendant challenging joinder under Rule 14 faces the "extremely difficult burden," *United States* v. *Casamento*, 887 F. 2d 1141, 1149 (2d Cir. 1989) (quoting *United States* v. *Carpentier*, 689 F. 2d 21, 27 (2d Cir. 1982)), of showing that he was so prejudiced by the joinder that he was denied a constitutionally fair trial. *United States* v. *Torres*, 901 F.2d 205, 230 (2d Cir. 1990); *United States* v. *Burke*, 700 F.2d 70, 83 (2d Cir. 1983). "Given the balance struck by Rule 8, which authorizes some prejudice against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice." *Amato*, 15 F.3d at 237 (quotation marks and citations omitted). Thus, to prevail on an argument that severance is necessary under Rule 14, "[t]he defendant [must] demonstrate[] that the failure to sever caused him substantial prejudice in the form of a miscarriage of justice." *Blackney*, 941 F.2d at 116 (quotation marks and citations omitted).

2.    Discussion

Joinder of the Threat Counts with the Fraud Counts is proper under Rule 8(a), and the trial should not be severed under Rule 14. The same core of evidence, much of which was discovered during a search of the defendant's residence and of his person incident to arrest, would be admissible in both trials. Moreover, in critical respects, the crimes charged in the Indictment are of similar character, and they are both connected to a common scheme or plan.

The Government expects the evidence at trial to show that the defendant's efforts to steal others' identities charged in the Fraud Counts facilitated his commission of the Threat Counts and enabled him to evade detection by law enforcement officials, and that both the Threat Counts and the Fraud Counts involve theft and misuse of others' identities.[7] Thus, both sets of

---

[7]    The Government also intends to offer at trial, pursuant to Federal Rule of Evidence 404(b), evidence that one of the motives for the defendant's identity theft-related

counts are part of a common scheme or plan, and are of similar character.  The defendant stole victims' identities using a variety of means and used their identification information to open up credit cards, debit cards, bank accounts, e-mail accounts, and to acquire goods and services such as mobile phones and post office boxes, in others' names without their authorization.  The defendant also used these fraudulently-obtained accounts and items to help perpetrate the threats and stalking conduct charged in the Threat Counts, including by using a mobile phone he had opened in the name of an identity theft victim to make threatening phone calls and send threatening text messages to Victim-1 and her family, and by using Victim-1's identity and personal identification information without her authorization.  Moreover, the conduct charged in the Threat Counts involves threats and stalking conduct in which the defendant purported to be other people, including Victim-1; the Bill of Particulars, for example, describes a threat to Victim-2 that was made in the name of an individual named "John," but that was in fact transmitted by the defendant (*see* Bill of Particulars ¶¶ 1(g), 2(e)), and the stalking conduct includes a facsimile in which the defendant, purporting to be Victim-1, fabricated a story alleging that Victim-1 was raped by her uncle, the husband of Victim-2.   While there are several identity theft victims who have no connection with the defendant's threatening and stalking conduct, because the Threat Counts and the Fraud Counts are intertwined in critical respects, and involve similarly false and fraudulent conduct, they have a "sufficient logical connection" to be joined under Rule 8(a).  *Ruiz*, 894 F.2d at 505.

        Moreover, the Government will need to offer the same core evidence to prove both the Fraud Counts and the Threat Counts.  With respect to the Threat Counts, to prove that the threats and stalking communications were in fact made by the defendant, even though several of them were made using a mobile phone established in an identity theft victim's name or using others' identities, the Government intends to offer testimony from Victim-1, Victim-2, and other victims of the Threat Counts describing the defendant's use of false identities and his use of their own identities without their authorization.  This testimony is also directly relevant to the Fraud Counts, which focus on the defendant's theft and misuse of others' identities.  Thus, were the trials to be severed, some of the same victims would be required to testify twice in order to put

---

crimes was his interest in evading detection by law enforcement officials who were attempting to apprehend him for a variety of offenses predating the charges alleged in the Indictment.  The defendant is wanted in Connecticut on probation violation charges arising out his conviction for the violent assault of his ex-wife and attempted kidnaping of their two sons; he is also wanted in Massachusetts on probation violation charges arising out of his conviction for the kidnaping of, and violent assault on, his sister.  Evidence of these assault and kidnaping crimes, and his conduct in connection with those offenses, is also admissible under Rule 404(b) as probative of the defendant's knowledge and intent with respect to the Threat Counts.  Thus, similar 404(b) evidence would be admissible in support of both the Fraud Counts and the Threat Counts.

Hon. Denise L. Cote
June 25, 2008
Page 11 of 15

this relevant evidence before two separate juries.[8]  Evidence seized from the defendant's residence pursuant to a search warrant, including the defendant's computer and hard drive, would also would be directly relevant to both the fraud and identity theft counts; his computer helps prove that he is the author of threatening and harassing communications charged in the Threat Counts, and that he is the perpetrator of the schemes to steal others' identities and obtain access devices without their authorization charged in the Fraud Counts.  Thus, were the Threat Counts and Fraud Counts severed, the agents who participated in the search and computer forensics analysts would need to testify twice, and the computer and other physical evidence obtained pursuant to the search would need to be introduced twice. Because joinder would enable substantial gains in trial economy, and the conduct charged in the Threat Counts and Fraud Counts are factually and logically intertwined, joinder is proper under Rule 8(a).  *See Werner*, 620 F.2d at 929.

Severance is also not warranted under Rule 14(a), as the defendant cannot show that one trial on all charges would cause him "substantial prejudice in the form of a miscarriage of justice." *Blackney*, 941 F.2d at 116 (quotation marks and citations omitted).  The Government does not dispute that there would be some prejudice resulting from a trial of the Threat Charges with the Fraud Charges; each set of charges relates to different—though, as set forth above, related—egregious conduct by the defendant, and thus trying the defendant for all of this conduct at once would likely cause the defendant some prejudice.  However, there would be "no substantial prejudice in the form of a miscarriage of justice" were the defendant to have to face all of the charges arising out of his criminal conduct in a single trial, particularly because any prejudice resulting from a joint trial on all counts may be cured by "less drastic measures—such as limiting instructions" as an alternative to severance.  *United States v. Fayrer*, 333 F.3d 110, 114 (2d Cir. 2003).

## C.    The Government Agrees that a Suppression Hearing is Warranted on the Defendant's Motions to Suppress

The Government agrees with the defendant that, because the resolution of the defendant's motion to suppress statements made incident to his arrest on January 11, 2008,[9] and his motion to suppress evidence seized incident to his arrests on January 11, 2008 and March 3, 2008, depends in part on a determination of factual issues, a suppression hearing is warranted on these motions.

---

[8]    This outcome would not only be inefficient; it would also be particularly traumatic to Victim-1, who was subjected to significant mental, physical and sexual abuse at the hands of the defendant.

[9]    The Government does not seek to introduce in its case-in-chief statements made by the defendant incident to his arrest on March 3, 2008.

Hon. Denise L. Cote
June 25, 2008
Page 12 of 15

The Government expects that the evidence introduced at the suppression hearing will reveal that both motions are without merit.  As to the motion to suppress statements made on January 11, 2008, the Government expects that the evidence will show that, while the defendant had been taken into custody at the time he made the statements at issue, the statements at issue were spontaneous utterances that were not made in response to police questioning or its functional equivalent.  Instead, the defendant's remarks appeared to represent an attempt to elicit information from the arresting agents concerning the nature of the allegations and investigation against him.  The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), do not apply to bar admission of the defendant's statements in these circumstances.  *See id.* at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *see also United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970) ("spontaneous utterance" made by defendant when taken into custody, prior to administration of *Miranda* warnings, admissible because not the result of police interrogation).

In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined the term "interrogation" under the *Miranda* rule as "express questioning or its functional equivalent." *Id.* at 300-01. The "functional equivalent" of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. Where there has been no interrogation under this definition, the suspect's statements are admissible even if the suspect was in custody when he made the statements. *Id.* at 300, 302-03; *see also Pennsylvania v. Muniz*, 496 U.S. 582, 603-04 (1990) (*Miranda* does not require suppression of spontaneous incriminating utterances made during questioning "attendant to police procedure"); *United States v. Gelzer*, 50 F.3d 1133, 1138 (2d Cir. 1995) (police officer's quip that arrest likely disrupted robbery defendant's New Year's Eve plans was not the functional equivalent of interrogation, and thus defendant's response, "[w]e're amateurs, not professionals," was admissible as a volunteered statement); *United States v. Montana*, 958 F.2d 516, 519 (2d Cir. 1992) (agent's response to defendant's unsolicited comment did not constitute interrogation, although it led to subsequent inculpatory statements by defendant); *United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987) (no interrogation where defendant was "not questioned, confronted with evidence, or even encouraged to be honest and tell the facts").  The defendant's statements, which were not made in response to police interrogation, are admissible under this legal standard.[10]

---

[10]        In any event, the defendant's provision of false identification information to the arresting agents is admissible, notwithstanding *Miranda*.  *See Nicholas v. Goord*, 430 F.3d 652, 680 (2d Cir. 2005) ("Although arrested persons may not ordinarily be interrogated without being given *Miranda* warnings, questions aimed at eliciting identifying or 'pedigree' information is permitted without warnings, even though the answers to such questions may become evidence either of the particular crime for which the suspect was arrested, or of some past or future crime not yet under investigation.").

Hon. Denise L. Cote
June 25, 2008
Page 13 of 15

The Government also expects that the evidence will show the defendant's papers and wallet were properly seized and searched incident to his arrest on January 11, 2008, and additional papers were also properly seized incident to his arrest on March 3, 2008.  Moreover, the contents of the wallet seized and searched on January 11, 2008 were photocopied and inventoried prior to the February 6, 2008 examination of the wallet described in the affidavit sworn on or about February 8, 2008, in support of a search warrant of the defendant's residence at 2773 Reservoir Avenue, Bronx, New York (the "Search Warrant Affidavit").[11]  Thus, they may be properly admitted at trial.

A lawful search incident to arrest is justified in part by "the need to preserve evidence on [the defendant's] person for later use at trial."  *United States v. Robinson*, 414 U.S. 218, 234 (1973); *see also Chimel v. California*, 395 U.S. 752, 762-63 (1969) ("it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction").  A search incident to arrest of a defendant's personal effects is *per se* reasonable under Fourth Amendment doctrine.  *See id.* at 235 ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."); *id.* at 222 (search of contents of crumpled cigarette package found within shirt pocket found to be authorized).  The scope of the permissible search includes wallets and other items on the defendant's person at the time of arrest. *See*, *e.g.*, *United States v. Molinaro*, 877 F.2d 1341, 1346-47 (7th Cir. 1989) ("The Supreme Court has upheld warrantless searches of an arrestee's person, including personal property contained in his pockets, as a search incident to arrest. Numerous courts have upheld the search of a defendant's wallet under this exception." (collecting cases) (citing *Robinson*, 414 U.S. at 218)); *United States v. Vaneenwyk*, 206 F. Supp. 2d 423, 426 (W.D.N.Y. 2002) ("It is also clear that the an object such as a day book, planner, address book, or the like is subject to seizure as part of a search incident to arrest"); *United States v. El-Gabrowny*, 876 F. Supp. 495, 499 (S.D.N.Y. 1994) (authorizing search of item in closed envelope on defendant's person, and concluding that "[o]nce the [defendant's] arrest was effected, it was proper to search [the defendant's] person incident to that arrest and to seize whatever that search disclosed").  Here the Government expects the evidence will show that the defendant was lawfully arrested, and a search of the defendant's personal effects, including his papers and wallet, occurred contemporaneously with his arrests.  Thus, the items may properly be introduced into evidence at trial.

---

[11]     A complete copy of the affidavit submitted in support of the search warrant is attached hereto as Exhibit C.

Hon. Denise L. Cote
June 25, 2008
Page 14 of 15

        Moreover, the Government expects that the evidence will also show that the defendant's wallet was inventoried, and its contents photocopied, prior to the February 6, 2008 date referenced in the search warrant affidavit.  This inventory search provides an independent justification for the denial of the defendant's motion to suppress evidence seized from the defendant's wallet.  *See Illinois v. Lafayette*, 462 U.S. 640, 646 (1983) ("At the stationhouse, it is entirely proper for police to remove and list or inventory property found on the person or in the person of an arrested person who is to be jailed. . . . Examining all the items removed from the arrestee's person and listing them or inventorying them is an entirely reasonable administrative procedure. . . . [I]nspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity."); *El-Gabrowny*, 876 F. Supp. at 501 (upholding search of defendant's personal effects under inevitable discovery rule where items would have been searched pursuant to standard inventory procedures incident to arrest).

Hon. Denise L. Cote
June 25, 2008
Page 15 of 15

## CONCLUSION

For the reasons stated above, the Court should deny the defendant's motion to dismiss Counts One and Two of the Indictment, and to sever the Fraud Counts from the Threat Counts. The Government consents to a suppression hearing on the defendant's motions to suppress statements made incident to his arrest on January 11, 2008 and evidence seized incident to his arrests on January 11, 2008 and March 3, 2008.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney


By:    s/ Howard S. Master_____
       Howard S. Master
       Assistant United States Attorney
       Southern District of New York
       (212) 637-2248

cc:    Fiona Doherty, Esq., Federal Defenders of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :     <u>INDICTMENT</u>

       -v.-         :     S1 08 Cr. 124 (DLC)

JOSEPH RAY JORDAN,       :
    a/k/a "Patrick Jordan,"
    a/k/a "Joe Jordan,"       :
    a/k/a "Douglas Fidler,"
    a/k/a "Joseph Landa,"       :
    a/k/a "Jason Kaufman,"
    a/k/a "Matthew McGlasson,"       :

             Defendant.       :

- - - - - - - - - - - - - - - - - - - x

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____ │
│ DATE FILED: 5\1\08          │
└─────────────────────────────┘
```

<u>COUNT ONE</u>

    The Grand Jury charges:

    1.  From on or about December 2007, up to and including January 11, 2008, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, willfully, knowingly did transmit in interstate and foreign commerce communications containing threats to kidnap a person and threats to injure the person of another, to wit, JORDAN made telephone calls, and sent e-mails and facsimiles, in which JORDAN threatened to kidnap his former girlfriend ("Victim-1"), and to injure the person of Victim-1, Victim-1's aunt ("Victim-2"), and other members of Victim-1's immediate family.

       (Title 18, United States Code, Section 875(c).)

COUNT TWO

The Grand Jury further charges:

2.    From on or about December 2007, up to and including January 11, 2008, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, knowingly, and willfully did threaten to assault, strike, wound, imprison, and offer violence to, and to violently attack the person of, and to make a violent attack on the private accommodation of an internationally protected person, in violation of Title 18, United States Code, section 112(a), and unlawfully, knowingly, and willfully threatened to seize and confine an internationally protected person, in violation of Title 18, United States Code, section 1201(a)(4), to wit, JORDAN made telephone calls, and sent e-mails and facsimiles, in which JORDAN threatened to attack the residence of Victim-2, who is an internationally protected person, and to seize and harm Victim-2 if Victim-2 resisted JORDAN's efforts to kidnap Victim-1.

(Title 18, United States Code, Section 878.)

-2-

COUNT THREE

The Grand Jury further charges:

3.     From on or about December 2007, up to and including January 11, 2008, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, willfully, knowingly and with the intent to injure, harass, intimidate, and cause substantial emotional distress to a person in another State, and with the intent to place a person in another State in reasonable fear of the death of, and serious bodily injury to, that person, and a member of the immediate family of that person, did use an interactive computer service and a facility of interstate and foreign commerce to engage in a course of conduct that did cause substantial emotional distress to that person and did place that person in reasonable fear of the death of, and serious bodily injury to, that person and a member of the immediate family of that person, to wit, JORDAN made threatening telephone calls and sent facsimiles and email messages that caused Victim-1 substantial emotional distress, and placed Victim-1 in reasonable fear of the death of, and serious bodily injury to, Victim-1 and members of Victim-1's immediate family.

(Title 18, United States Code, Section 2261A(2).)

-3-

## COUNTS FOUR THROUGH SIX

### Mail Fraud

The Grand Jury further charges:

4.   On or about the dates set forth below, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, for the purpose of executing such scheme and artifice and attempting so to do, did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom, such matters and things, and did cause to be delivered by mail and such carriers, according to the direction thereon, such matters and things, to wit, JORDAN, having devised a scheme to fraudulently obtain the personal identification information of other individuals, and to use that information to obtain credit cards, debit cards and bank accounts in the names of those individuals without their knowledge or authorization,

-4-

caused the following items, as described in the table below, to be delivered by mail to addresses in the Southern District of New York:

| Count | Mailing | Address Mailed to | Approximate Date of Mailing |
|-------|---------|-------------------|-----------------------------|
| 4 | Background check form from Victim-3 | 123 Essex Street #47 New York, NY 10002 | January 2007 |
| 5 | Background check form from Victim-4 | 39 Bowery, #614 New York, NY 10002 | January 2007 |
| 6 | Background check form from Victim-5 | 39 Bowery, #614 New York, NY 10002 | March 2007 |

(Title 18, United States Code, Sections 1341 and 2.)

COUNT SEVEN

The Grand Jury further charges:

5.    From at least in or about 2005, up to and including in or about January 11, 2008, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, willfully, and knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person during and in relation to a felony enumerated in Section 1028A(c), to wit, JORDAN possessed and used means of identification belonging to other individuals that were mailed to JORDAN to obtain unauthorized credit cards,

-5-

debit cards and bank accounts as charged in Counts Four through Six of this Indictment.

(Title 18, United States Code, Sections 1028A and 2.)

COUNT EIGHT

Access Device Fraud

The Grand Jury further charges:

6.    From at least in or about 2005, up to and including in or about January 11, 2008, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, willfully, and knowingly and with intent to defraud did effect transactions, with one and more access devices issued to another person or persons, to receive payment and things of value during a one-year period, the aggregate value of which is equal to and greater than $1,000, which conduct did affect interstate and foreign commerce, to wit, JORDAN, during a one-year period, made use of credit cards, debit cards, and bank account numbers issued in the names of other individuals without their knowledge or authorization, to purchase goods and make cash withdrawals from automated teller machines.

(Title 18, United States Code, Sections 1029(a)(5) and 2.)

COUNT NINE

Possessing Access Devices

The Grand Jury further charges:

7.     From at least in or about 2005, up to and including in or about January 11, 2008, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, willfully, and knowingly and with intent to defraud did possess fifteen and more devices which are counterfeit and unauthorized access devices, which conduct did affect interstate and foreign commerce, to wit, JORDAN possessed at least fifteen unauthorized credit cards, debit cards, and bank account numbers issued in the names of other individuals.

(Title 18, United States Code, Sections 1029(a)(3) and 2.)

COUNT TEN

The Grand Jury further charges:

8.     From at least in or about 2005, up to and including in or about January 11, 2008, in the Southern District of New York and elsewhere, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, unlawfully, willfully, and knowingly did transfer, possess, and use, without lawful authority, a means of identification of

another person during and in relation to a felony enumerated in Section 1028A(c), to wit, JORDAN possessed and used means of identification belonging to other individuals to obtain and use unauthorized credit cards, debit cards, and bank account numbers, as charged in Counts Eight and Nine of this Indictment.

(Title 18, United States Code, Sections 1028A and 2.)

### FORFEITURE ALLEGATION

AS TO COUNTS FOUR THROUGH TEN

9.    As a result of committing the offenses alleged in Counts Four through Twelve of this Indictment, JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, constituting or derived from proceeds obtained directly or indirectly as a result of the mail fraud, access device fraud, and aggravated identity theft offenses set forth in the above counts.

### Substitute Asset Provision

10.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

-8-

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to 28 U.S.C. § 2461, to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981,
Title 28, United States Code, Section 2461.)


FOREPERSON

MICHAEL J. GARCIA
United States Attorney

-9-

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

### - v. -

### JOSEPH RAY JORDAN,

a/k/a "Patrick Jordan,"
a/k/a "Joe Jordan,"
a/k/a "Douglas Fidler,"
a/k/a "Joseph Landa,"
a/k/a "Jason Kaufman,"
a/k/a "Matthew McGlasson,"

### Defendant.

### INDICTMENT

08 Cr.

(18 U.S.C. §§ 875, 878, 2261A,
1341, 1028A, 1029 & 2.)

_____
MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL,

_____
Foreperson.

Filed indictment. Case previously assigned to Judge Cote.
Francis, J.

SRM
5/1/08



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 9, 2008

**BY FACSIMILE**

Fiona Doherty, Esq.
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York 10007

     Re:    <u>United States</u> v. <u>Joseph Ray Jordan,</u>
              S1 08 Cr. 124 (DLC)

Dear Ms. Doherty:

        Pursuant to the defendant's motion for a bill of particulars under Fed. R. Crim. P. 7(f), the Government submits the following bill of particulars for Counts One and Two of the Superseding Indictment in the captioned case:

        <u>Count One</u>: Count One charges JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a "Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a "Matthew McGlasson," the defendant, with violating Title 18, United States Code, Section 875(c) by transmitting in interstate or foreign commerce threats with to kidnap his former girlfriend ("Victim-1"), and to injure the person of Victim-1, Victim-1's aunt ("Victim-2"), and other members of Victim-1's immediate family. Following are particulars of the threats alleged in Count One:

        a.      Between in or about December 5, 2007, and in or about December 16, 2007, JORDAN stated to Victim-1 via telephone that, in sum and substance, he would "kill" Victim-1 and "take [her] off the planet."

        b.      Between in or about December 7, 2007, and in or about December 16, 2007, JORDAN stated to Victim-1's sister and Victim-1's mother via telephone that, in sum and substance, he would "kill" them and "wipe all of [them] off the face of the earth."

Ms. Fiona Doherty, Esq.
June 9, 2008
Page 2 of 4

      c.      On or about January 2, 2008, JORDAN sent a facsimile that stated, among other things: "Emergency situation as [Victim-2] is in grave danger. . . . There are 3-4 men (3 Jamaican, 1 British) and 1 woman (unknown decent) in London. . . . Background is that two brothers hold hatred toward [Victim-2]. . . . They are not well financed, but are now living in London awaiting right opportunity to get at [Victim-2]. . . . Have maybe two AK-47 shipped Jamaica-Miami-UK via FedEx . . . . My friend believes they will wait and act when the opportunity arrives both against [Victim-2] and her family."

      d.      On or about January 3, 2008, JORDAN sent an e-mail to Victim-1 that stated, among other things: "I am now convinced that you need to be rescued. Remember, if you are quickly grabbed sometime in the next 2 weeks or so, relax, no one is to harm you. But, just like when a body guard is ushering away a politician from harm, a few men may need to quickly grab you and wisk you away for your protection, so you can escape youraunt's control . . . . John and his girl are training two men who will help. If you are with your aunt, she must stay uninvolved when it goes down. There will likely be no tolerance for interference from her or her laughable 'body guards.' They will notact until they are least expected – so stay prepared – keep your important things with you. We will putvphase1 into action unless I hear from you directly that you are safe and living of your own free will. . . . I am so worried about you. You are a prisoner. You cannot do what you want. Youraunt is holding you. Don't worry. Weareabout to make world news with our rescue."

      e.      On or about January 5, 2008, JORDAN sent a text message to Victim-1 via telephone that stated: "We are finally ready. Now just waiting for moment least expected. Always keep your passport on you starting today. Here's code word that only you will know: baby oil. That should tell you when we will strike."

      f.      On or about January 5, 2008, JORDAN sent a text message to Victim-1 via telephone that stated: "My friend Monique offered of this place go Paris. I might go and return only on the day of the rescue. That may be tomorrow or 2 or more weeks from now. The call is john's. Be ready. Joe."

      g.      On or about January 5, 2008, JORDAN sent a facsimile to Victim-2 that stated, among other things: "You are to immediately apologize by telephone call to the offended party. It is very likely that failure to do so will be regretted. . . . [I]n order to be able [t]o go about your life in a secure and comfortable manner, . . . and without the need albeit imperfect for increased security and overwhelming expense, you must prove that the young woman is safe, acting only of her own free will, and not being manipulated, controlled, or otherwise held against her own free will. . . . Basically, world news that you will not like can occur, or you can be wise and diplomatic. John."

Ms. Fiona Doherty, Esq.
June 9, 2008
Page 3 of 4

     <u>Count Two</u>: Count Two charges JOSEPH RAY JORDAN, a/k/a "Patrick Jordan," a/k/a
"Joe Jordan," a/k/a "Douglas Fidler," a/k/a "Joseph Landa," a/k/a "Jason Kaufman," a/k/a
"Matthew McGlasson," the defendant, with violating Title 18, United States Code, Section 878
by threatening to attack the residence of Victim-2, who is an internationally protected person, and
to seize and harm Victim-2 if Victim-2 resisted JORDAN's efforts to kidnap Victim-1.
Following are particulars of the threats alleged in Count Two:

     a.     On or about January 2, 2008, JORDAN sent a facsimile that stated, among
other things: "Emergency situation as [Victim-2] is in grave danger. . . . There are 3-4 men (3
Jamaican, 1 British) and 1 woman (unknown decent) in London. . . . Background is that two
brothers hold hatred toward [Victim-2]. . . . They are not well financed, but are now living in
London awaiting [the] right opportunity to get at [Victim-2]. . . . Have maybe two AK-47
shipped Jamaica-Miami-UK via FedEx . . . . My friend believes they will wait and act when the
opportunity arrives both against [Victim-2] and her family."

     b.     On or about January 3, 2008, JORDAN sent an e-mail to Victim-1 that
stated, among other things: "I am now convinced that you need to be rescued. Remember, if
youare quickly grabbed sometime in the next 2 weeks or so, relax, no one is to harm you. But,
just like when a body guardis ushering away a politician from harm, a few men may need to
quickly grab you and wisk you away for your protection, so you can escape youraunt's control
. . . . John and his girl are training two men who will help. If you are with your aunt, she must
stay uninvolved when it goes down. There will likely be no tolerance for interference from her
or her laughable 'body guards.' They will notact until they are least expected – so stay prepared
– keep your important things with you. We will putvphase1 into action unless I hear from you
directly that you are safe and living of your own free will. . . . I am so worried about you. You
are a prisoner. You cannot do what you want. Youraunt is holding you. Don't worry.
Weareabout to make world news with our rescue."

     c.     On or about January 5, 2008, JORDAN sent a text message to Victim-1
via telephone that stated: "We are finally ready. Now just waiting for moment least expected.
Always keep your passport on you starting today. Here's code word that only you will know:
baby oil. That should tell you when we will strike."

     d.     On or about January 5, 2008, JORDAN sent a text message to Victim-1
via telephone that stated: "My friend Monique offered of this place go Paris. I might go and
return only on the day of the rescue. That may be tomorrow or 2 or more weeks from now. The
call is john's. Be ready. Joe."

     e.     On or about January 5, 2008, JORDAN sent a facsimile to Victim-2 that
stated, among other things: "You are to immediately apologize by telephone call to the offended
party. It is very likely that failure to do so will be regretted. . . . [I]n order to be able [t]o go about

Ms. Fiona Doherty, Esq.
June 9, 2008
Page 4 of 4

your life in a secure and comfortable manner, . . . and without the need albeit imperfect for increased security and overwhelming expense, you must prove that the young woman is safe, acting only of her own free will, and not being manipulated, controlled, or otherwise held against her own free will. . . .  Basically, world news that you will not like can occur, or you can be wise and diplomatic.  John."

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

By:   _____

Howard S. Master
Assistant United States Attorney
(212) 637-2248

cc:   The Honorable Denise L. Cote (by hand delivery)

AO
(Rev. 8/97)

## AFFIDAVIT FOR SEARCH WARRANT

| **United States District Court** | **DISTRICT** Southern District of New York | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>PREMISES KNOWN AND DESCRIBED AS<br><br>2773 Reservoir Avenue, 2nd Floor (padlocked room & common areas), Bronx, New York, 10468, and all locked and closed containers | **DOCKET NO.** 08 MAG | **MAGISTRATE'S CASE NO.** 0262 |
| | **To:**<br>United States Magistrate Judge | |

The undersigned being duly sworn deposes and says: That he/she has reason to believe that

| ☐ on the person   ☒ on the premises | **DISTRICT**  Southern District of New York |
|---|---|

### PREMISES KNOWN AND DESCRIBED AS

2773 Reservoir Avenue, 2nd Floor (padlocked room & common areas), Bronx, New York, 10468, and all locked and closed containers

The following property is concealed:

SEE ATTACHED AFFIDAVIT

Affiant alleges the following grounds for search and seizure[2]

SEE ATTACHED AFFIDAVIT

See attached affidavit which is incorporated as part of this affidavit for search warrant
Affiant states the following facts establishing the foregoing grounds for issuance of a Search Warrant

SEE ATTACHED AFFIDAVIT

| SIGNATURE OF AFFIANT<br><br>*Brandon M. Waller* | OFFICIAL TITLE, IF ANY<br>Brandon Waller<br>Special Agent, Federal Bureau of Investigation |
|---|---|
| Sworn to before me, and subscribed in my presence:<br>DATE   FEB 0 6 2008 | JUDGE' OR FEDERAL MAGISTRATE<br>S/ *Douglas F. Eaton* |

United States Judge or Judge of a State Court of Record.
If a search is to be authorized "at any time in the day or night" pursuant to Federal Rules of Criminal Procedure 41(c), show reasonable cause therefor

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION OF       :
THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR THE              :-
PREMISES KNOWN AND DESCRIBED
AS 2773 RESERVOIR AVENUE, 2ND FLOOR       :
(LOCKED ROOM & COMMON AREAS),
 BRONX, NEW YORK, 10468,                  :
AND ALL LOCKED AND CLOSED CONTAINERS
                                          :
- - - - - - - - - - - - - - - - - - x

**TO BE FILED
UNDER SEAL**

AFFIDAVIT IN
SUPPORT OF A
SEARCH WARRANT

SOUTHERN DISTRICT OF NEW YORK, ss.:

  I, BRANDON WALLER, being duly sworn, depose and say:

  1. I am a Special Agent with the Federal Bureau of Investigation and have been so employed for approximately 5 years.  I am presently assigned to a task force which investigates interstate threatening communications and apprehends fugitives, among other matters.  I have participated in numerous investigations involving, among other things, the use of computer systems, telephones, and facsimiles to transmit threatening communications, and am familiar with the use of fraudulent identification and other documents to perpetrate the above crimes.  I have participated in the execution of numerous searches and seizures pursuant to warrants.

  2. I have participated in the investigation of this matter, and I am familiar with the information contained in this affidavit based on my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, my training and experience, and numerous discussions I have had with other law

enforcement personnel concerning the offenses that are the subject of this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the PREMISES described below, I have not included herein the details of every aspect of the investigation. Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

3. I respectfully submit this affidavit in support of an application for a warrant to search the premises known and described as a padlocked room and all common areas accessible to all residents of the second floor of 2773 Reservoir Avenue, 2nd Floor, Bronx, New York, 10468 (the "PREMISES"), and all locked and closed containers therein and the contents thereof. Based on the facts set forth in this affidavit, there is probable cause to believe that there is presently located at the PREMISES evidence and instrumentalities of violations of federal law, including violations of Title 18, United States Code, Sections 875 (interstate transmission threats to kidnap or injure); 878 (threats to an internationally protected person); 1029 (access device fraud); and 1028A (aggravated identity theft). Such evidence includes the items set forth in Exhibit A to the Search Warrant.

THE PREMISES

4. I know from personal knowledge that 2773 Reservoir Avenue is a two-story detached red brick building (the "Building"),

2

located between 195th Street and Strong Avenue in the Bronx, New
York.  The second floor of the Building is reached from a stairwell
that is located on the left side of the foyer of the Building, to
the left of the front entrance.  The PREMISES consists of a room that
is reached through a padlocked door and that is behind the top of the
stairs and facing the front of the house; a hallway and kitchen
located at the top of the stairs; a storage area that is adjacent to
the padlocked door; and several unlocked storage rooms.  The
padlocked door is white, and is locked with a large external padlock.
There are boxes with the name "James Jordan" on them piled up next to
the door of the padlocked room.  The second floor of the Building has
two other rooms that are resided in and exclusively occupied by two
other individuals ("Resident-1" and "Resident-2").

## THE INVESTIGATION

5.    The basis for this application for a search warrant is
information gathered from on or about December 2007 to the present in
connection with an ongoing investigation into potential interstate
threat, stalking, and identity theft offenses committed by JOSEPH RAY
JORDAN, a/k/a "Patrick Jordan," a/k/a "James Jordan," a/k/a "Joe
Jordan," a/k/a "Douglas Fidler" (the "Investigation").  In summary, the
Investigation has uncovered evidence that JORDAN physically abused his
former girlfriend ("Victim-1"), who resided in Queens, New York, and
caused her to flee from New York to her sister's home in Virginia to
escape from JORDAN.   JORDAN then began making phone calls and sending

3

emails to Victim-1 and her family members in Virginia in which he threatened to kill or injure Victim-1 and her family members. Victim-1 then fled to the United Kingdom in an effort to escape and hide from JORDAN. Victim-1 stayed at the official residence of her aunt ("Victim-2"), who is a foreign country's ambassador to the United Kingdom and other European nations. After JORDAN discovered that Victim-1 had fled to Victim-2's official residence, JORDAN began making phone calls and sending facsimiles to the official residence, and sending emails to Victim-1, in which he threatened to attack Victim-2's official residence, and to kill or injure Victim-1 and Victim-2. The investigation has also revealed that JORDAN has opened accounts in the name of "Douglas Fidler" using the Social Security number of Douglas Fidler, whom records searches have revealed is a person residing in California who has no known relation to JORDAN, and that JORDAN possesses a debit card in the name of another person.

6.    I have spoken with Victim-1, who told me the following:

a)    Victim-1 is a citizen of the United States.

b)    In or about July 2007, Victim-1 began dating JORDAN.

c)    During August 2007, JORDAN began staying overnight with Victim-1 at the home of Victim-1's mother in Queens, New York.

d)    In or about August 2007, JORDAN told Victim-1

4

that he hired a woman ("Individual-1") to work as his secretary.

     e)   On one day in August 2007, JORDAN told Victim-1 that he previously had asked his ex-wife to pick out people for him to punch and then punched them. JORDAN then asked Victim-1 to pick out a person for him to "slash." Victim-1 had observed JORDAN carrying a knife on that day and believed that he was carrying a knife at that time. Victim-1 refused to pick a person for JORDAN to "slash" and told him that she no longer wished to see him. JORDAN and Victim-1 then returned to the home of Victim-1's mother. JORDAN placed a metal hanger around the wrists of Victim-1 and used them as handcuffs. JORDAN threw Victim-1 into a bathtub, causing tiles to fall off the wall and injuring Victim-1's back. JORDAN then forced Victim-1 to have sexual intercourse with him against Victim-1's will.

     f)   In or about September 2007, JORDAN punched Victim-1 several times in the face in a single day with a closed fist, leaving bruises on her face.

     g)   From in or about late September 2007 through in or about late October 2007, JORDAN and Victim-1 stayed in Las Vegas, Nevada. On one day during this time, JORDAN punched Victim-1 repeatedly in the face, causing Victim-1 to lose vision in one of her eyes for a period of two weeks. In or about October 2007, while JORDAN and Victim-1 were in Nevada, JORDAN hit Victim-1 in the face while they were in the street.

h)    From in or about August 2007 to December 2007, JORDAN told Victim-1 on multiple occasions that he had killed someone in Mexico.  JORDAN's statements and abusive conduct placed Victim-1 in fear that JORDAN was capable of killing her.

i)    On or about December 1, 2007, Victim-1 saw her mother, who told her that Victim-1 had to leave JORDAN or she would die.

j)    On or about December 3, 2007, Victim-1 left the house where Victim-1 and JORDAN had been staying.

k)    On or about December 3 or 4, 2007, JORDAN spoke to Victim-1 over the telephone and threatened to slash Victim-1's face as she walked down the street.  JORDAN also stated that he would rape Victim-1, ruin her career, and send obscene pictures of Victim-1 to her former employers.  Victim-1 knew at that time that JORDAN had taken obscene pictures of her because he had shown them to her.

l)    On or about December 5, 2007, Victim-1 travelled to her sister's house in Virginia in an attempt to escape and hide from JORDAN.  Victim-1 stayed at her sister's house until on or about December 16, 2007.  During this period, JORDAN told Victim-1 over the telephone that even though he was in New York, he could "get to" Victim-1.  JORDAN also stated over the telephone that he would "kill" Victim-1 and "take [her] off the planet."  These statements caused Victim-1 substantial emotional distress and placed

6

Victim-1 in fear of death or serious bodily injury.

   m) On or about December 16, 2007, Victim-1 flew to the United Kingdom at the invitation of Victim-2, to stay with Victim-2 at Victim-2's official residence in London, England, in a further effort to escape and hide from JORDAN.

   n) On or about January 3, 2008, Victim-1 received two threatening emails from JORDAN, as discussed below.

   o) Victim-1 informed me that JORDAN had at least two phone numbers, including a number for a cell phone (the "Cell Phone Number") and a phone number in the 212 area code that he used to receive voicemails in connection with his business ventures (the "212 Phone Number").

   p) Victim-1 also informed me that JORDAN owned a laptop computer and often carried the laptop computer with him to send emails and use the Internet.

   7. Based on my review of printed emails, which I obtained from another FBI agent ("Agent-1") who had obtained them from Victim-1, I learned the following, among other things:

   a) On or about January 3, 2008, Victim-1 received an email from an email account belonging to JORDAN stating, among other things, that JORDAN was in London. The email also said, "if I don't hear from you, I will know that you are being held against your will or kept out of what is the truth" and "If I don't get a response, we have a plan to help you and to get you away from your

Aunt's inordinate control."  JORDAN also mentioned in the email that he was "with [Individual-1]."

    b)  On or about January 3, 2008, Victim-1 received another email from JORDAN, sent from the same account, stating, among other things, that Victim-1 had stated that her father and uncle molested her.  In the email, JORDAN asked whether Victim-2 might have "other enemies."  Jordan stated that Victim-2 had threatened him and was trying to hold and control Victim-1.  JORDAN also made the following statements concerning a plan to forcibly capture Victim-1:

> I am now convinced that you need to be rescued.  Remember, if you are quickly grabbed sometime in the next 2 weeks or so, relax, no one is to harm you.  But, just like when a body guardis [sic] ushering away a politician from harm, a few men may need to quickly grab you and wisk [sic] you away for your protection, so you can escape youraunt's [sic] control. . .. . [M]aybe I'll just hold [money I have for you] until [I] rescue you.  John and his girl are training two men who will help.  If you are with your aunt, she must stay uninvolved when it goes down.  There will likely be no tolerance for interference from her or her laughable "body guards."  They will notact [sic] until they are least expected - so stay prepared - keep your important things with you.  We will putvphase1 [sic] into action unless I hear from you directly that you are safe and living of your own free will.

The email went on to state that Victim-1 was Victim-2's "prisoner" and that "we are about to make world news with our rescue."

    8.  Based on my interview of Victim-2 and my review of a written statement made by Victim-2, I learned the following, among other things:

    a)  Victim-2 serves as the High Commissioner for a

8

foreign country in London, United Kingdom, and resides in an official residence in London. Victim-2 also serves as an ambassador to several other countries.

b) Victim-1 is the daughter of Victim-2's sister.

c) In or about December 2007, Victim-1 telephoned Victim-2 and told her that she was in a relationship with JORDAN and that JORDAN was brutally violent toward her. Victim-1 asked Victim-2 if she could stay with Victim-2 at her residence in London in order to escape and hide from JORDAN. Victim-2 agreed to this proposal.

d) On or about December 17, 2007, Victim-1 arrived in the United Kingdom and began staying at the official residence of Victim-2 in London.

e) On or about December 28, 2007, JORDAN made several phone calls to Victim-2's official residence under several different identities. In one of the phone calls, JORDAN left a message stating that he would be leaving New York that evening for London. Victim-2 became frightened and reported this to her security staff and law enforcement authorities in the United Kingdom.

f) On or about December 30, 2007, Victim-2 received a facsimile at her office, purporting to be from Victim-1, addressed to Embassy staff. The facsimile was sent from a phone number associated with JORDAN. The facsimile falsely alleged that

9

Victim-2's husband had repeatedly raped Victim-1 with Victim-2's knowledge when Victim-1 was a teenager. The facsimile was sent to other embassies and received by various press organizations.

g) On or about December 31, 2007, Victim-2 changed her home phone number because she continued to receive harassing and threatening telephone calls from JORDAN.

h) On or about January 2, 2008, Victim-2 received a facsimile that she believed to be from JORDAN stating that individuals with AK-47s were in London and were preparing to attack Victim-2 and her family.

i) In early January 2008, Victim-1 showed Victim-2 the emails from JORDAN to Victim-1, dated January 3, 2008, that are quoted above. The facsimiles and e-mails sent by JORDAN made Victim-2 fear that she would be killed or seriously injured by JORDAN.

8. Based on my review of facsimiles obtained from Agent-1, I have learned the following, among other things:

a) On or about January 2, 2008, Victim-2 received a two-page facsimile that had been addressed to "Ambassador" from a "P Dmoe." The cover page of the facsimile does not provide phone, fax, or address information for the sender. The first page of the facsimile states, among other things, that the Victim-1 "is in grave danger." The second page of the facsimile states, among other things that three or four men and one woman, who are in London,

10

"hold hatred toward" [Victim-2] and "are not well financed, but are now living in London awaiting [the] right opportunity to get at [Victim-2]." The facsimile further states that these individuals "[h]ave maybe two AK-47 shipped Jamaica-Miami-UK via FedEx," and that "my friend believes they will wait and act when the opportunity arrives both against [Victim-2] and her family."

        b)   The cover page of the January 2, 2008 facsimile is identical in format to the cover page of another facsimile that was also sent to Victim-2 on January 2, 2008, which purports to be from Individual-1. In addition, it is identical in format to the cover page of another facsimile sent to Victim-2 from "Sheraton Hotel" on or about January 4, 2008 which states "A complete apology for [Victim-1] is in her email," and to the cover page of the facsimile sent on or about December 30, 2007, referenced above, which lists Victim-1's home address and the 212 Phone Number as the source of the fax.

        9.   In the course of the investigation, I have learned that JORDAN was a fugitive who was wanted by the State of Connecticut for criminal conduct involving attempted kidnaping and other offenses, and who had been indicted by the United States Attorney's Office for the District of Connecticut for Unlawful Flight to Avoid Prosecution, in violation of Title 18, United States Code, Section 1073. On January 11, 2008, the FBI located JORDAN in the vicinity of 123 Essex Street, New York, NY, and placed JORDAN

11

under arrest pursuant to a warrant that had been issued by the District of Connecticut. Incident to arrest, JORDAN would not tell arresting officers where he resided. A wallet, a large folding knife, keys, and a cell phone, among other material, was recovered from JORDAN incident to arrest. JORDAN was not carrying a laptop computer when he was arrested.

10.    A business card of a car service company that contained a handwritten note listing the address of the Building was located during a routine inventory search of JORDAN's wallet that took place on February 6, 2008.

11.    I learned from a detective with the New York City Police Department ("NYPD") ("Detective-1") that on February 6, 2008, he and another NYPD detective ("Detective-2") traveled to the Building to determine whether the Building contained JORDAN's residence. Detective-1 informed me that Resident-1 recognized a picture of JORDAN that Detective-1 presented to him and stated that JORDAN moved into the building in the summer of 2006, and that he, Resident-2, and JORDAN were the only residents of the second floor of the Building.

12.    On February 7, 2008, Detective-1 and I returned to the Building to interview Resident-1 and Resident-2. Resident-1 stated that he had lived in the Building for over five years. Resident-1 stated that he, Resident-2, and JORDAN were the only residents of the second floor of the Building, and that the three

12

shared a kitchen and bathroom on the second floor of the Building. Resident-1 stated that JORDAN resided in the room on the second floor that was locked with a padlock, and was the only resident of that room. Resident-1 stated that he had not seen JORDAN in several weeks, but that no one else to his knowledge had access to the PREMISES or had entered the PREMISES since he had last seen JORDAN. Resident-1 further stated that he often saw JORDAN using a laptop computer in the common areas of the PREMISES.

13. Resident-2 also stated that he, Resident-1, and JORDAN were the only three people who lived on the second floor of the Building, and that the three shared a kitchen and bathroom on the second floor of the Building. Resident-2 also stated that JORDAN resided in the room on the second floor that was locked with a padlock, and was the only resident of that room. Resident-2 stated that he had not seen JORDAN in several weeks and was unaware of JORDAN's arrest, but that no one else to his knowledge had access to the PREMISES or had entered the premises since he had last seen JORDAN.

14. Resident-1 and Resident-2 permitted Detective-1 and me to walk around the common areas of the PREMISES during our visit on February 7, 2008. During this examination we saw, in plain view, boxes with the name "James Jordan" on them piled up next to the door of the padlocked room. In addition, we saw packaging material for a fax machine and scanner stacked among boxes with the name "Jordan"

13

written on the boxes.

15.  I have reviewed a document provided to me by the provider of cell phone service for the Cell Phone Number.  The document explains that several dozen calls were made from the Cell Phone Number to phone numbers associated with Victim-1, Victim-1's sister in Virginia and Victim-2 in the United Kingdom, and that over 30 of those calls were routed through a cell site in the vicinity of 2780 University Avenue, Bronx, New York (the "Cell Site").

16.  I know from my training and experience that cell phone calls routed through a cell site must be made from within close proximity to that cell site.  I know from examination of a map of the Bronx that the Cell Site is located one block from the Building.  In addition, a computer records check for police reports originating from the Building revealed that an unrelated 911 call made from the Building was routed through the Cell Site.

17.  In the course of the investigation, I have learned that JORDAN had signed up for the Cell Phone Number and the 212 Number under the alias "Douglas Fidler" using a Social Security Number ending in "6522."  I conducted a search of commercial databases and determined that a person named Douglas Fidler, with a Social Security Number ending in "6522," lives in California and has no known relation to JORDAN.  Upon arrest on January 11, 2008, JORDAN stated that his Social Security number ends in "7272."  A small printed card that was found during a routine inventory search

14

of JORDAN's wallet contains the phone number of JORDAN's cell phone provider followed by the following language: "DF last 4: 6522." A bank debit card in the name of a "Joseph Landa" also was found during a routine inventory search of JORDAN's wallet.

## REQUEST TO SEARCH THE PREMISES

18.   In light of the foregoing information, and based on my experience and training, I submit that there is probable cause to believe that the PREMISES, including any closed or locked containers therein and the contents thereof, contains evidence, fruits and instrumentalities of violations of at least Title 18, Sections 875 (interstate transmission threats to kidnap or injure); 878 (threats to an internationally protected person); 1029 (access device fraud); and 1028A (aggravated identity theft), and that the following fruits and instrumentalities of those violations can be found at the PREMISES:

a.   Records, documents, files, and other material which relate to personal and proprietary identification or account information of JORDAN, as set forth in greater detail in paragraph 1 of Exhibit A, are believed to be at the PREMISES because JORDAN resides at the PREMISES and, based on my experience and training, individuals keep such information at their residences. This information is sought to corroborate other evidence found in the course of the Investigation and to facilitate access to the computers and electronic equipment used as instrumentalities of

JORDAN's criminal conduct.

      b.    Electronic equipment and data storage media such as fax machines, computers, cameras, and data discs, as set forth in greater detail in paragraph 2 of Exhibit A, are believed to be at the PREMISES because JORDAN is believed to have used computers and fax machines to transmit threatening emails and facsimiles to Victim-1 and Victim-2. Victim-1 stated that JORDAN had a laptop computer which he used frequently, Resident-1 stated that JORDAN often used his laptop computer at the PREMISES, packaging materials for a fax machine and other electronic equipment, with JORDAN's name on them, were visible in plain view in the common areas of the PREMISES, and the fax and computer used to commit the offenses have not otherwise been found. In addition, cameras and photo equipment are sought because JORDAN is believed to have taken obscene pictures of Victim-1 and threatened to send them to Victim-1's former employers. Based on my training and experience, particularly my experience in executing numerous computer crime-related search warrants, as well as my consultations with other law enforcement officers, electronic evidence of JORDAN's criminal activities is likely to remain on his computer(s) for a lengthy period of time primarily due to the nature of electronic evidence.

      c. Envelopes, letters, and other correspondence, including evidence of electronic communications, as set forth in greater detail in paragraph 3 of Exhibit A, are believed to be at

16

the PREMISES because JORDAN resides at the PREMISES and, based on my experience and training, individuals keep such information at their residences.  This information is sought because JORDAN is believed to have sent threatening correspondence to Victim-1 and Victim-2.

        d.   Records evidencing occupancy or ownership of the PREMISES, as set forth in greater detail in paragraph 4 of Exhibit A, are believed to be at the PREMISES because JORDAN resides at the PREMISES and, based on my experience and training, individuals keep such information at their residences.  This information is sought to corroborate other evidence found in the course of the Investigation and to demonstrate that JORDAN possesses evidence, fruits or instrumentalities of criminal activity seized from the PREMISES.

        e.   Records evidencing ownership or use of computer equipment found in the PREMISES, as set forth in greater detail in paragraph 5 of Exhibit A, are believed to be at the PREMISES because JORDAN resides at the PREMISES and, based on my experience and training, individuals keep such information at their residences.  This information is sought to corroborate other evidence found in the course of the Investigation and to demonstrate that JORDAN possesses evidence, fruits or instrumentalities of criminal activity obtained from computer equipment seized at the PREMISES.

        f.   Identification information for other persons, as set forth in greater detail in paragraph 6 of Exhibit A, is believed to be at the PREMISES because JORDAN is believed to have used other

17

individuals' identities without their authorization to obtain access
devices, goods and services, and statements and other identification
information related to these individuals is likely to be at JORDAN's
residence in order to facilitate the unauthorized use of these
identities.    This information is sought because it will be direct
evidence, or fruits and instrumentalities, of access device fraud
and aggravated identity theft crimes.

19.    The evidence, fruits, and instrumentalities of the
offenses include the items described in Exhibit A, attached, and
include any of the attached items that are maintained within other
closed or locked envelopes, packages, or containers, including safes
and other containers that may be further secured by key locks (or
combination locks) of various kinds.

### METHODS TO BE USED TO SEIZE AND SEARCH COMPUTERS AND COMPUTER-RELATED EQUIPMENT

20.    Based upon my training, experience, and information
related to me by agents and others involved in the forensic
examination of computers, I know that computer data can be stored on
a variety of systems and storage devices including hard disk drives,
floppy disks, compact disks, magnetic tapes and memory chips.    I
also know that searching computerized information for evidence or
instrumentalities of a crime commonly requires agents to seize most
or all of a computer system's input/output peripheral devices,
related software documentation, and data security devices (including
passwords) so that a qualified computer expert can accurately

18

retrieve the system's data in a laboratory or other controlled environment. This is true for the following reasons:

      a.   Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

      b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

      c.   The volume of data stored on many computer systems and storage devices will typically be so large that it will

19

be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

        d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time

is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

21. In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items contain contraband and whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b. If the computer equipment and storage devices cannot be searched on-site within a reasonable amount of time and without jeopardizing the ability to preserve the data, and if the computer equipment and storage devices do not contain contraband, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data.

c. If the computer personnel determine that these items contain contraband, or that it is not practical to perform an on-site search or make an on-site copy of the data, then the

21

computer equipment and storage devices will be seized and
transported to an appropriate law enforcement laboratory for review.
The computer equipment and storage devices will be reviewed by
appropriately trained personnel in order to extract and seize any
data that falls within the list of items to be seized set forth
herein.

        d.    The analysis of electronically stored data,
whether performed on-site or in a separate, controlled environment,
may entail any or all of several different techniques.  Such
techniques may include, but shall not be limited to, surveying
various file "directories" and the individual files they contain
(analogous to looking at the outside of a file cabinet for the
markings it contains and opening a drawer believed to contain
pertinent files); "opening" or reading the first few "pages" of such
files in order to determine their precise contents; "scanning"
storage areas to discover and possibly recover recently deleted
data; scanning storage areas for deliberately hidden files; and
performing electronic "key-word" searches through all electronic
storage areas to determine whether occurrences of language contained
in such storage areas exist that are related to the subject matter
of the investigation.

        22.  Any data that is encrypted and unreadable will not be
returned unless law enforcement personnel have determined that the
data is not (1) an instrumentality of the offense, (2) a fruit of

22

the criminal activity, (3) contraband, (4) otherwise unlawfully
possessed, or (5) evidence of the offense specified above.

    23.  In searching the data, the computer personnel may
examine all of the data contained in the computer equipment and
storage devices to view their precise contents and determine whether
the data falls within the items to be seized as set forth herein.
In addition, the computer personnel may search for and attempt to
recover "deleted," "hidden" or encrypted data to determine whether
the data falls within the list of items to be seized as set forth
herein.[1]

    24.  If the computer personnel determine that the computer
equipment and storage devices are no longer necessary to retrieve
and preserve the data, and the items are not subject to seizure
pursuant to Federal Rule of Criminal Procedure 41(b), the government
will promptly return these items, upon request, within a reasonable
period of time.

    24.  In order to search for data that is capable of being
read or interpreted by a computer, law enforcement personnel will
need to seize and search the following items, subject to the
procedures set forth above:

        a.   Any computer equipment and storage device
capable of being used to commit, further or store evidence of the
offenses listed above;

---

[1]    Agents will have procedures in place to segregate any
potentially privileged materials or files.

23

b.   Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

24

WHEREFORE, I respectfully request that the Search Warrant sought herein issue pursuant to Rule 41 of the Federal Rules of Criminal Procedure, permitting authorized agents or officers to enter the PREMISES and therein to search for and seize the items listed in Exhibit A.

BRANDON WALLER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
_____ day of February, 2008

FEB 0 8 2008

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

DOUGLAS F. EATON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

25