UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :
                                        :
              -v-                       :        S2 08 Cr. 124 (DLC)
                                        :
JOSEPH RAY JORDAN,                      :        OPINION AND ORDER
                        Defendant.      :
                                        :
----------------------------------------X

Appearances:

For the United States of America:
Howard Master
Daniel Stein
Assistant United States Attorneys
United States Attorney's Office
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

For Defendant Joseph Ray Jordan:
Henry J. Steinglass
299 Broadway, Suite 1802
New York, NY 10007

DENISE COTE, District Judge:

      Defendant Joseph Ray Jordan ("Jordan") was indicted on

February 14, 2008, and is charged in a twelve-count superseding

indictment ("Indictment") filed on August 26, 2008.  Trial on

five of the counts, the counts related to witness tampering and

transmitting threatening communications, began on October 6,

2008.[1]  The jury reached its verdict on October 16, finding

Jordan guilty on all five counts.  Jordan has now moved pursuant

---
[1] Trial on the remaining seven counts is scheduled to begin on
April 27, 2009.

to Rules 29 and 33, Fed. R. Crim. P, to set aside the verdict on
these five counts and to dismiss the counts or, in the
alternative, to grant a new trial.  For the following reasons,
the motion is denied.

The motion presents a myriad of issues, although it
emphasizes three: that the Court deprived Jordan of his right to
represent himself; that there was insufficient evidence to
support the verdict on the three threat counts; and that defense
counsel did not consult with Jordan sufficiently regarding the
decision to testify at trial.  This Opinion will therefore begin
with a recitation of the defendant's communications with the
Court on the issue of self-representation before summarizing the
evidence at trial.


BACKGROUND

I. The Defendant's Representational History

Jordan was arrested on January 11 on a fugitive warrant
from Connecticut, and was held in state custody until March 3,
when he was brought into federal custody on the original
indictment in this case, which had been filed on February 14.
Fiona Doherty of the Federal Defenders was appointed on March 3
to represent Jordan.  At a conference on May 8, Jordan was
arraigned on the first superseding indictment and the parties
requested a trial date in August.  Trial was scheduled for

August 4.  On July 2, the Court held a conference with the parties to address the defendant's request for an adjournment of the trial date so that a competency examination of the defendant could be undertaken.  With the parties' consent, the Court scheduled a suppression hearing for July 23 -- a date that was later adjourned to August 21 -- and adjourned the trial date to October 6.  Ms. Doherty informed the Court that someone else from her office would have to take over the case because she would be starting maternity leave in September.  The Court stated that it would "expect that person to take over immediately to join you today in representing the defendant." Ms. Doherty agreed.

Julia Gatto of the Federal Defenders joined the case, and within a couple of weeks, Sabrina Shroff from the same office joined as well.  At the next conference, held on July 30, both Ms. Gatto and Ms. Shroff were present along with Ms. Doherty. At the suppression hearing held on August 21, all three defense attorneys appeared, and Ms. Doherty continued to work on the case until at least the week of September 15.

Ms. Gatto and Ms. Shroff continued their representation of Jordan through the end of the October 6 trial.  After the verdict was rendered and the jurors excused, the Court told the parties that it wished to appoint new counsel for the defendant. It explained, "At the latter stages of this trial, as the record

reflects, the defendant had several complaints about his representation.  I don't find they were well founded. . . . [B]ut I think it would be a burden on the defendant and defense counsel in these circumstances to continue with each other." CJA attorney Henry Steinglass was assigned to represent the defendant that same day, and the parties met the next day -- with Ms. Gatto and Ms. Shroff present as well -- to address Mr. Steinglass's scheduling concerns and to settle on a schedule for the instant motion.

II. The Defendant's Communications with the Court

Jordan sent numerous letters directly to the Court over the course of this case, despite repeated instructions from the Court informing Jordan that so long as he was represented by counsel any communications with the Court would have to come through his attorneys.  The defendant's letters are summarized here in the order in which they were received by this Court's Chambers.

The first set of letters arrived soon after the defendant's arraignment on the original indictment.  One submission was dated March 7, 2008, and a second was dated March 10, 2008. They were received by the Court on March 12.  Among other things, in these letters Jordan made several requests concerning

4

his representation, the charges against him, discovery, and subpoenas he wished the Court to issue.[2]

Next, on July 24, 2008, this Court's Chambers received a letter dated July 18 from the defendant.[3]  In it, he stated that he had "begun the process of making the decision as to whether or not to represent myself at trial.  I understand that such a motion must be made in a timely fashion.  Therefore, do kindly inform me as to the deadline date -- if any -- for such a motion."  Jordan also noted that he anticipated filing other motions in his case and requested a copy of "the Attorney's file."  The July 24 letter was the subject of a conference held with the parties on July 30.  At the conference, the Court informed the defendant that he has a right under the

---

[2] These submissions were the subject of an Order dated March 17, by which the Court provided copies of the letters to defendant's counsel and directed the defendant to cease corresponding directly with the Court so long as he is represented by counsel.

[3] In addition to the letters and submissions that the defendant sent to the Court under his own name, the Court also received two typewritten-letters purporting to be from sisters of the defendant.  The first, dated May 11 and received on May 13, was signed "Carol Marie Jordan."  It disputed the accusations against Jordan and concluded by stating, "Again, please don't allow a federal court to be used as a tool to show 'power' by a woman who is an ambassador of an island nation with a history of political violence and corruption."  The second letter was dated May 12, postmarked May 17, and received on May 19.  This one, signed "Carol Nestlebush," claimed that Simone Thenault was calling and harassing members of the Jordan family, and stated that Thenault's "crazy brothers" had criminal records.  Copies of both letters were provided to all counsel on May 15 and June 4, respectively.

Constitution to represent himself, but that in all instances in which a defendant wishes to represent himself, the Court must first conduct "a complete and thorough inquiry to make sure that a defendant is waiving or giving up his right to counsel in a way that is knowing and voluntary and intelligent." The Court therefore instructed the defendant that, if he wishes to represent himself at trial, he should communicate that fact to one of his attorneys, who would then promptly notify the Court so that the necessary hearing could be scheduled and independent counsel could be appointed to advise the defendant with respect to that decision. The Court emphasized, however, that the trial date had already been moved once and "will not be moved again."

The next submission sent by Jordan to the Court was dated August 11, 2008, but postmarked August 20, received by this Court's Pro Se Office on August 21, and received by this Court's Chambers on August 22. The submission was addressed to the attention of "Administrative Justice," and it included a typewritten letter with a handwritten "addendum" attached. In this submission, Jordan complained principally that he did not have enough information about the charges against him and that he did not believe he or his attorneys could be adequately prepared for the October 6 trial date.

Jordan also sent a second letter dated August 11, 2008. This seventeen-page handwritten letter was received by this

Court's Pro Se Office on August 25, and by this Court's Chambers on August 26.[4]  In this letter, which was also addressed to the attention of "Administrative Justice," Jordan complained mainly about the limited access he had to voluminous discovery materials pertaining to Counts Four to Ten and his concern that he would not have time adequately to review the materials ahead of the October 6 trial date.  Jordan also claimed to have received notice that the Federal Defenders would ask to withdraw from his case due to a conflict of interest.  Finally, while not the focus of Jordan's letter, the issue of his possible self-representation is mentioned as well.  He stated that although he had notified the Court that he had begun the process of deciding whether to represent himself, "I feel restricted in my ability to do so by the fact that I have not had adequate opportunity to review discovery materials."  Additionally, Jordan wrote in a footnote, "Should I opt to represent myself at trial, my decision shall not be based on whether or not I am or am not satisfied with counsel's ability to do so."

The Court addressed the two letters from the defendant received on August 22 and August 26 at a conference held with the parties on August 26.  The Court advised the defendant he

---

[4] The postmark date on the envelope is not legible, but it is apparent from the August 25 date on which the Pro Se Office received the envelope that it was not placed into the mail stream until well after the letter's August 11 date.

should not be communicating with the Court ex parte, but should instead talk to his lawyers, who will then write to the Court or file motions on his behalf.  Jordan was told that if he sent anything further to the Court, the Court would "send it back to him."  The Court also addressed the defendant's references to the possibility of proceeding pro se, telling the defendant that it would not advise him of any deadline for that decision.  The Court reiterated that the defendant "has certain rights in this regard, which, if he did make an application, I would discuss with him in great detail, but that application will not change the trial date should the defendant decide to proceed pro se."  With regard to the defendant's reference to a possible conflict of interest for the Federal Defenders that would require their withdrawal from the case, the Court inquired of defense counsel whether they would indeed seek to be relieved.  They responded that there was no conflict of interest and that their client "does understand that there is no conflict of interest."  The Court also inquired about the defendant's references to the frequency of his meetings with counsel and the opportunities to review discovery material, and defense counsel represented that they spoke with Jordan after receiving a copy of his letter, "and he informed us that he is satisfied with the number of opportunities he's had to meet representatives from our office, specifically in the last couple of weeks."

8

Subsequently, the Court received a letter from the defendant dated August 27, 2008 but addressed to his attorney. The letter was attached to a cover sheet titled "Copy Ex Parte to the Court To Be Kept in Case File 08-CR-124 / This Is Not A Letter To The Judge."  The submission was postmarked September 11, 2008, was received by this Court's Pro Se Office on September 12, and by this Court's Chambers on September 19 ("September 19 Letter").  The Court made a copy of the September 19 Letter, and by Order dated September 19, instructed the Pro Se Office to mail the September 19 Letter back to the defendant.[5]

Jordan next sent two motions to the "U.S. District Court, Clerk," with a letter dated September 12, 2008 explaining, "Although I have not yet made a decision as to whether or not to represent myself at trial, given the time constraints I must file these papers at this time."  These motions -- one titled "Defendant's Request for Discovery or, in the Alternative, Motion for Discovery," and the other "Ex Parte Motion for Order of Court To Secure Evidence for Trial" -- were received by this Court's Clerk's Office on September 15 and entered onto the docket report for this action on September 24.  They were received by Chambers on the morning of September 25, after they had been docketed.  The Court provided the parties with copies

---

[5] As discussed below, the purported contents of the September 19 Letter were a critical component of the defendant's pending motions.

of the two motions at a conference held the morning of September 25, and it stated, "I am not further addressing these. As I advised the defendant if there are motions to be made or communications to be made on his behalf, it will be through counsel."

Another motion, this one dated September 20, 2008, was received by this Court's Pro Se Office on September 23, and by this Court's Chambers on October 1 ("October 1 Motion"). The October 1 Motion, titled "Ex Parte Notice to Court Regarding Right To Proceed Pro Se," was attached to a cover sheet directing the Clerk of Court to file "the enclosed notice regarding self-representation," and to "bring to the attention of the Court, at your earliest convenience." Jordan requested in the submission that "in advance of the announcement of his decision on whether or not he will represent himself at trial . . . that, should there be any question as to his mental competency to do so, the issue be addressed at this time." Jordan stated near the end of the letter that "[h]e has not yet made the decision [to represent himself] -- but he is leaning toward self-representation."

The Court provided counsel with copies of Jordan's October 1 Motion and scheduled a conference to address the submission. Later on October 1, the Court also received a letter from defense counsel dated October 1 requesting a status conference

because Jordan had informed counsel that he wished to represent
himself at trial.  The conference was held on October 2.  The
Court asked defense counsel, "does the defendant, as you
understand it right now, wish to represent himself at his
trial?"  Counsel stated that they had spoken to him briefly
before the conference and that he told them "his mind was not
made up."  The Court then explained that it had prepared a five-
page detailed allocution "to pursue with the defendant if and
when he decides he would like to represent himself at trial."
The Court further advised the defendant that if he wished to
explore the issue further, he should discuss it with his
counsel, and that, if the defendant wished, the Court "would be
happy to appoint independent counsel to sit down and talk with
him about that option.  And the pros and cons of making that
decision."  The Court, however, reiterated that "our trial is
going forward on Monday no matter what."  It also explained the
basis for its own perception that the defendant was "being very
ably represented in this case by counsel."  The Court then asked
defense counsel to consult with Jordan once more as to "whether
he wishes me to appoint independent counsel now to consult with
him on this issue or whether he wants to proceed to trial pro se
or not."  After consulting with their client, counsel
represented that "he does not feel the need to consult with
independent Criminal Justice Act Counsel at this time."  The

Court inquired again whether the defendant was "asking me at this time to proceed <u>pro se</u> at trial."  Counsel consulted with Jordan once more and reported that "Mr. Jordan informs us that he has not yet made that decision."

Four more motions, these dated October 1, 2008, were mailed by Jordan to the "Pro Se Clerk" on October 2, received by this Court's Pro Se Office on October 3, and entered onto the case's docket report on October 8.  They were received by this Court's Chambers on October 9.  The first of these motions was to sever Counts One to Three from Counts Eleven to Twelve; the second was a motion to dismiss; the third was a "renewed motion to suppress evidence"; and the fourth was titled a "Motion for Continuance and Notice to Court."  In the last of these motions, Jordan, among other things, complained of problems with his representation and stated that "[h]e's placed in a Constitutionally unfair position: He must proceed to trial with current counsel, and suffer the consequences of a partially-prepared defense; . . . or represent himself without the opportunity to remedy first the significant shortcomings in trial preparation."

The Court addressed these four motions before the trial resumed on the morning of October 14.[6]  The Court repeated its instructions to the defendant that he should "not send anything to the court, clerk of court, me. . . .  You have lawyers.  They are the ones who should communicate on your behalf."  Defense counsel asked that the Court address on the record the defendant's claims concerning the adequacy of his representation and his communications with counsel.  Defense counsel represented that they had visited the defendant multiple times before and during the trial, and had reviewed all relevant documents with him.  The Court stated its view that the defendant "has been represented aggressively by defense counsel during the pretrial period."  That representation "had a substantial effect on the shape of this trial.  Counts were severed.  Evidence was kept from being admitted in this trial. . . . The cross-examinations by defense counsel of the government's witnesses have been vigorous and sustained, showing a detailed knowledge of the evidentiary record, including all the documents."

With respect to the defendant's discussion about his ability to proceed pro se, the Court stated that "[a]t no time before the trial period did he ever communicate through counsel

---

[6] October 14 was the date on which trial proceedings resumed following a five-day break that started on October 9 for the Yom Kippur holiday and continued through Columbus Day on October 13.

to me that he wished to proceed <u>pro se</u>.  I advised him from the time this first arose that if he wanted to proceed <u>pro se</u>, it was his right, but I would be conducting an inquiry to make sure that he understood the ramifications of that decision.  He never asked for that inquiry to be undertaken."  The Court also referenced its repeated warnings to the defendant "from the beginning" that the trial date, which had already been moved once to accommodate defense counsel's request for a competency examination, would not be moved again.  The Court advised the defendant that it would not interrupt the trial to conduct the necessary inquiry, and that "if the defendant wished to proceed <u>pro se</u>," the Court could have conducted the inquiry during the five-day break in the trial; in any event, the Court still did not "have a clear statement from the defendant that he wishes to proceed <u>pro se</u> in this trial."

Jordan's counsel handed the Court two additional letters from Jordan during the course of the trial on October 15; they were marked as Court Exhibits.  The first of these letters, marked as Court Exhibit 6, was a four-page typed letter titled "Request To Plead No Contest," passed up to the Court just before the day's lunch break.  In this letter, dated October 10, 2008, Jordan provided several reasons for wanting to plead no contest, including a poor relationship with his counsel and his belief that the stipulation his counsel wished that he sign to

eliminate the need for his ex-wife's testimony contained several
falsehoods.  Before handing this letter up to the Court,
Jordan's counsel informed the Court -- after consulting with
Jordan -- that "he will stand by the stipulation. . . . [W]hat
he tells me now is different than what is in the letter."  The
second letter was given to the Court during the charging
conference, which the Court held with the parties during the
lunch break on October 15, and was marked as Court Exhibit 8.
In this thirteen-page handwritten letter, dated October 14,
2008, Jordan again complained principally of his counsel,
stating, "Let it be hereby known . . . that I cannot proceed
with current counsel -- . . . I am convinced that they dislike
me, I am convinced that I cannot communicate with them, and I am
convinced that I cannot now . . . willfully make any decisions
in this case."  Elsewhere in the letter, Jordan wrote, "I want
to testify, but am not prepared."

        At the end of the charging conference, the Court addressed
the letter marked as Court Exhibit 6.  It confirmed with defense
counsel that they had advised their client that a plea of no
contest in this district could only be entered with the consent
of the Government.  The Court then addressed Jordan's complaints
about counsel, and noted that he seemed "very well advised about
the case," and that independent counsel who had consulted with
him earlier that day had also advised the Court that Jordan

"thoroughly" understood his rights with respect to the decision
to testify.[7]  The Court further noted that the defendant "hasn't
suggested that there is any evidentiary surprise that has
occurred during the course of this trial."  Moreover, "The
letter identifies no line of cross that should have been
undertaken that was not, no exhibit that should have been
introduced that is not being introduced, no defense witness that
should have been called that is not being called, no question
that he put to counsel that has not been responded to."  The
Court also noted defense counsel's "vigorous" cross-
examinations, and their thorough preparation and knowledge of
the relevant documents and expected testimony.

The letter marked as Court Exhibit 8 was addressed by the
Court the next day, after the verdict was read.  Among other

---

[7] On the morning of October 15, defense counsel notified the
Court that Jordan wished to speak with independent counsel
regarding his right to testify, as well as other matters.  The
Court appointed Criminal Justice Act attorney ("CJA") Edward
Kratt, who met with Jordan during the mid-morning break.  After
the break, Mr. Kratt reported to the Court that he had finished
consulting with Jordan, that he had spoken with him concerning
his right to testify or not, and that Jordan "is aware of his
rights in those regards and obviously his decision is his
decision.  I'm sure he will inform his lawyer in court of that."
Mr. Kratt also notified the Court that Jordan had written a
letter he wanted Mr. Kratt to bring to the Court's attention.
The Court advised that if the defendant "decides he wants me to
have that letter he can give it to his attorneys who are
representing him in this case and consult with them about it and
if after those discussions they believe it's appropriate for me
to receive that letter I'd [be] happy to receive it."  The
letter was received that day and marked as Court Exhibit 6.

things, the Court noted that "at no time" had the defendant
requested the opportunity to proceed pro se.  Despite "frequent
references in his communications to the fact that he was
considering that decision," and the Court's explanations "on
several occasions" [of] his right to take that step if he
requests to do so, . . . no request was ever made."  The Court,
furthermore, found no basis from its observations for Jordan "to
be feeling disappointed in the quality of his representation."
Rather, the Court attributed the defendant's growing attacks on
his counsel to "the weight of the government's evidence [at
trial], which was overwhelming," and "the increasing likelihood
that there would be a conviction here, that there was no real
defense to the evidence which was in large part documentary and
irrefutable."  The defendant thus became "desperate, so he
lashed out at his counsel, complained that he wanted to testify
but was unready or unprepared to testify, unprepared to proceed
with his trial despite months of preparation by both him and his
attorneys for this trial."  The Court also repeated an earlier
request that defense counsel provide the Court with a history of
their visitation and consultations with the defendant.

    Finally, this Court's Chambers received a "Notice of Motion
Regarding Self-Representation" from Jordan on October 17

("October 17 Motion").[8]  This submission -- addressed to the Pro

Se Clerk -- was postmarked October 6, received by this Court's

Pro Se Office on October 7, and entered on the docket report for

this case on October 16, which was the day that the jury

returned its verdict.  The submission only came to the Court's

attention on the morning of October 17, after it was docketed by

the Clerk's Office.  In the filing, Jordan gave "notice that he

shall move the Court to allow him to represent himself at trial

in this matter."  He wrote that he "shall orally make the motion

for self-representation."

     The Court addressed the October 17 Motion at a conference

held later that same day with the parties and Jordan's newly

appointed counsel.  After it gave counsel copies of this

submission, the Court explained to incoming counsel that

"[p]rior to trial and during trial, . . . the defendant either

directly or through his attorney brought to my attention that he

was considering making a request to represent himself, but he

never actually made such a request."

---

[8] The defendant relies on this submission several times in his
moving and reply papers, but he refers to it as the "10/7/08
motion" based on the date it was received by the Court's Pro Se
Office, or as "Document No. 74" according to the submission's
docket entry number.  Although the docket report lists the
October 7 date, it also clearly reflects that the document was
not entered on the docket report by the Court's Clerk's Office
until October 16.  The defendant asserts on this motion that the
submission was "not addressed" by the Court, but the Court in
fact referenced the submission at the October 17 conference and
provided counsel with copies.

III. The Counts Tried

    The first three counts tried at the October 6 trial addressed the period from December 2007 through January 11, 2008.  Count One charged that the defendant knowingly transmitted by email, facsimile, and through telephone calls threats to kidnap or injure a former girlfriend, Simone Thenault, or members of her family; Count Two charged that he knowingly threatened to assault and kidnap Thenault's aunt, Glenda Morean-Phillip, who at that time was an ambassador from the Republic of Trinidad and Tobago to the United Kingdom and thus an "internationally protected person" as that term is defined under the law; and Count Three charged that he knowingly and with intent to harass Thenault and place her in reasonable fear of serious bodily injury made telephone calls that caused Thenault emotional distress and placed her in reasonable fear of serious bodily injury.  This third count was limited at trial to the time period from December 5, 2007 and up to and including December 17, 2007.

    The last two charges, which were tried at the October 6 trial as Counts Four and Five of a redacted Indictment,[9] concerned the period from February through June 2008.  They were that the defendant knowingly used intimidation and threats with

_____

[9] These correspond to Counts Eleven and Twelve of the August 26 Indictment.  For the remainder of this Opinion, these witness tampering counts are referred to as Counts Four and Five.

the intent of influencing or preventing the testimony of
Thenault and Morean-Phillip, respectively, in this criminal
prosecution.

IV. The Evidence at Trial

    The trial lasted from October 6 to October 16, with a five-
day break in the middle for holidays and the weekend.  At the
end of proceedings on October 8, when the five-day break was to
begin, the Government represented on the record that it expected
to rest no later than lunchtime on October 15.[10]  During the six
days of trial, the Government called fifteen witnesses,
including Thenault, Morean-Phillip, Thenault's mother Diane
Dodson, Thenault's sister Kyiana Patrice Adams, Thenault's
brother-in-law Roderick Adams, Thenault's former boyfriend David
Weller, Jordan's friend Dr. Sebastian Mayer, and a notary named
Frederick Ford, as well as several British and American law
enforcement officers.  Jordan did not put on a defense case.

    Viewed in the light most favorable to the Government, the
evidence presented at trial established the following.  Jordan
met Thenault at a bar in New York City in July 2007, and the two
began to date shortly thereafter.  Their relationship quickly
became verbally and physically abusive.  On one occasion, Jordan
and Thenault were walking down a street when Jordan became

---

[10] At that time, defense counsel stated that they did not yet
know whether there would be a defense case.

agitated and directed Thenault to pick someone on the street for
him to slash with the knife he carried.  She refused.  One
night, Thenault attempted to lock herself in a bathroom to
protect herself from Jordan's violence, but he got into the
bathroom and pushed Thenault into the bathtub, injuring her
back.  On another occasion, the defendant was out with Thenault
when he became agitated and began threatening strangers on the
street with his knife.  He then took Thenault to a hotel room,
and proceeded to beat her and force her to have sex with him.
In addition to the abuse he inflicted, Jordan instilled fear in
Thenault by telling her, for instance, that he had killed
someone in Mexico and that he had spent time in prison for
trying to get his children from his ex-wife.  He told her that
if she reported the abuse to anyone, he would take Thenault and
her family "off the face of the planet."  Jordan's abuse and
Thenault's fear escalated to the point that, on December 2,
Thenault told her mother that Jordan was abusing her and that
she believed that she would die if she did not leave by the next
day.  Early on the morning of December 3, Thenault fled from
Jordan, together with her mother, first to a friend's home and
then to her sister's house in Virginia.

While she was in Virginia, Thenault received numerous
telephone calls on her cell phone from the defendant at all
hours of the day and night.  The defendant also discovered the

Adamses' telephone number and repeatedly called their Virginia

home, as well as calling Mr. Adams at work.  Mr. Adams testified

that Jordan stated to him during one of the calls, "I will have

you wiped off the map."  Ms. Dodson testified that in one of the

calls she received on her cell phone while in Virginia before

changing her number, Jordan said "he will kill and take me off

the face of the earth."  Also during this time, many strangers

were calling the Adams house in response to advertisements for

sex and for housing that Jordan had posted listing the Adamses'

home telephone number on the website Craig's List.  The Adamses

changed their home telephone number as a result, but the

defendant then began calling the new number.  He also called Ms.

Adams's cell phone.  Thenault, Dodson, Ms. Adams, and Mr. Adams

each testified that they were afraid of what the defendant might

do to them, and they feared that he had already or would soon

come to Virginia.[11]  Officers who spoke with the victims during

this time testified that they were visibly shaken and

distressed.

　　　While Thenault was in Virginia, Jordan told her, among

other things, that he would hurt her ex-boyfriend David Weller.

---

[11] The victims' fear was magnified by other incidents that
occurred during this time.  Ms. Adams, for example, testified to
receiving a telephone call from a local florist asking for her
address so they could deliver a package from Joseph Jordan.  She
feared from that telephone call that the defendant either
already knew which area she lived in or was trying to learn her
specific address.

Mr. Weller testified that during this time, he received telephone calls in which the caller threatened to hunt him down in the street and hire men to come get him, as well as calls from many strangers responding to Craig's List and print advertisements for sex and housing.

Also during this time, on December 7, 2007, Jordan registered the domain name SimoneThenault.com, and on the publicly available website he described his relationship with Thenault.  Among other things, he wrote, "I hurt her -- both physically and emotionally," and after she left, "I reacted with anger.  I said angry words I would never mean, but I frightened her . . . .  I also said foolish things to some members of her family . . . people who have always treated me with kindness and respect."  He added, "For the past few days, without sleep, I have been researching . . . domestic violence and anger management."  The jury was shown printouts of the website.

As the threats and harassment persisted, Thenault continued to fear for her life and, in about the middle of December, she fled to London, to the official residence of her aunt, Ambassador Glenda Morean-Phillip.  By around December 27, Jordan began calling Morean-Phillip's official residence, as well as her Embassy.  When making these calls, Jordan purported to be -- among other people -- an ex-boyfriend of Thenault's, David Weller.  Upon being told of the content of one of the calls that

her Embassy received, Morean-Phillip "immediately" called the police and, by December 31, had the telephone number of her official residence changed.

Morean-Phillip and Thenault then began receiving facsimiles at the Embassy, as well as e-mails and text messages, which contained threats to attack Morean-Phillip's official residence and to kidnap Thenault.  Some of the facsimiles contained allegations of misconduct by Morean-Phillip's husband Oscar.[12] The communications -- which were shown to the jury -- placed Thenault and Morean-Phillip in such fear that they turned these messages over to law enforcement.  Law enforcement witnesses from London testified to the victims' frightened demeanors.[13]

Jordan was arrested by FBI agents on January 11, 2008.[14]  He soon began to write letters in an effort to discourage or prevent Thenault and Morean-Phillip from testifying against him at trial.  While Jordan sent some of these communications in his

---

[12] Thenault testified at trial that she had told Jordan in confidence early in their relationship about certain misconduct by her uncle.  That uncle had died years earlier and was not Morean-Phillip's current husband.

[13] At about this time, Ms. Dodson stopped receiving mail at her home address; the defendant had changed her address to his own post office box.

[14] When the agents stopped Jordan and asked him for identification, he presented a driver's license under the name Patrick Jordan.

own name, he forged the names of others to several of them.[15]

These communications included an affidavit purporting to be by

his ex-wife, Robyn Foss ("Foss affidavit"),[16] stating that the

years of her marriage to Jordan were "the happiest in [her]

life," and seeking to explain the circumstances that led to

Jordan's conviction for assaulting her and attempting to kidnap

their children.[17]  The affidavit also stated that she intended to

testify at trial as to the defendant's good character.  These

assertions, as well as Ms. Foss's purported authorship of the

affidavit and signature on it, were refuted by a testimonial

stipulation of Ms. Foss, entered into by the Government, defense

counsel, and Jordan himself.[18]

---

[15] Jordan was able to send many of these communications from jail
by mailing them to a friend, Dr. Sebastian Mayer, with
directions on how to locate the necessary addresses and forward
the mailings to their intended recipients.  During Dr. Mayer's
testimony at trial, the jury heard a recording of a conversation
between Jordan and Dr. Mayer in which they discussed the "draft
press release" described below, and Dr. Mayer expressed concern
that it could be regarded as "blackmail."

[16] The Foss affidavit was dated April 5, but it arrived in an
envelope with a May postmark date.

[17] The affidavit appeared to be notarized by an individual named
Frederick Ford.  Frederick Ford testified at trial that he had
previously notarized documents for Jordan, but that the
signature on the Foss affidavit purporting to be his was forged.

[18] The procedural background of this stipulation is described in
detail below.

Jordan also tried to send a letter to Thenault which purported to be from one of his sisters, Elyse Shoemaker.[19]  This letter urged Thenault to "write to the judge and tell her that the allegation is a mistake," because she would be "put through so much stress" and "trauma" at trial, and her mother would also "be under awful pressure at trial."  Another letter that was actually mailed to Thenault, which purported to be from Jordan's sister Carol Nestlebush and which was postmarked May 3,[20] stated that Jordan's defense team included private investigators who were being paid for "partly by his ex-wife Robyn," and advised Thenault that "giving up on what you two had and loosing [sic] someone who is probably meant for you is something that will probably not work out well for anyone."  Among the letters that Jordan wrote to Thenault under his own name was one postmarked May 29 where he wrote, "Problem I see is you seem to be easily tricked or controlled by what others say or think. . . .  No one respects or wants to be around a 'victim.'  Even the cops are

---

[19] This letter was obtained by the FBI from Jordan's sister Carol Nestlebush.  It was inside a sealed envelope within an outer envelope addressed to Nestlebush and postmarked June 2.  The envelope addressed to Nestlebush came with a white piece of paper in which Jordan instructed his sister: "mail my letter to Simone by regular mail. . . . No Return Address.  You are really helping.  I'm proud of you."

[20] The envelope addressed to Thenault listed "S. Mayer" in the return address.

saying to me 'what were you doing f------ around with a (racial slur).'  Typical cops."[21]

The defendant also sought to interfere with Morean-Phillip's participation at trial by sending fabricated documents to Trinidad and Tobago government offices.  These communications included a purported "press release" from "Jordan Family Media Relations."  One such "press release" was sent in May 2008 to Trinidad's consulate in New York, which then forwarded copies to Trinidad's Minister of Foreign Affairs and to Morean-Phillip.  The "press release" made defamatory allegations about Morean-Phillip's husband and predicted that those allegations would be explored at Jordan's impending trial, and it further stated that Morean-Phillip's transfer to the United States "has been delayed pending discussions to resolve the legal case without trial -- a trial that may prove a huge embarrassment for the government of Trinidad and Tobago."[22]  A copy of the same document was sent to "High Commissioner Trinidad and Tobago Press Secretary" in London.  Morean-Phillip testified to the emotional distress and professional humiliation that these communications caused.

---

[21] Jordan is white and Thenault is black.

[22] Morean-Phillip currently serves as Trinidad and Tobago's ambassador to the United States; her transfer from the United Kingdom was not delayed.

V. The Foss Stipulation

In a pre-trial motion, the defense sought, among other things, to preclude evidence of Jordan's abusive relationship with his ex-wife, Ms. Foss.  Jordan's counsel argued that the Court should limit any testimony by Ms. Foss to the single question of whether she wrote, signed, or otherwise adopted the Foss affidavit.  At a pre-trial conference on September 25, the Court noted that any limitation on Ms. Foss's testimony would depend on the scope of cross-examination and whether it put her credibility in issue.  The Court suggested that the parties consider entering into a stipulation to avoid Ms. Foss's live testimony entirely.  By the next pre-trial conference, held on September 29, the parties had exchanged drafts of a proposed stipulation with respect to Ms. Foss's testimony.  They handed their respective versions of the stipulation to the Court.  The defendant's draft was marked as Court Exhibit 1, and the Government's draft was marked as Court Exhibit 2.  The Court noted that the parties had "made a lot of progress," and that it seemed they would "be able to work through the remaining issues and that Ms. Foss will not need to be called as a witness. . . . I think this is very much in the defendant's interest."

In the second week of trial, on October 14, counsel for the defendant informed the Court that Jordan was "not inclined to sign the stipulation that would prevent Ms. Foss from taking the

28

witness stand."  The Court responded that it was "not entirely
surprised.  The defendant has a right to refuse to stipulate.
He has a right to stipulate. . . . [H]is stipulation would have
had the impact of severely restricting the evidence that defense
counsel have argued could be harmful to the defendant in coming
in."  Ms. Foss therefore flew into town and arrived at the
courthouse on October 15 prepared to testify.  On the morning of
October 15, defense counsel informed the Court that the
defendant had signed the Foss stipulation.[23]


DISCUSSION

The defendant moves pursuant to Rules 29 and 33, Fed. R.
Crim. P., to set aside the verdict, dismiss the five counts on
which the defendant was convicted, or for a new trial.  Rule 29
permits a defendant to move for a judgment of acquittal on the
basis of the insufficiency of the evidence.  Fed. R. Crim. P.
29(c).  A judgment of acquittal should only be entered if the
court concludes that "no rational trier of fact could have found
the defendant guilty beyond a reasonable doubt."  <u>United States</u>

---

[23] The stipulation, marked as Government Exhibit ("GX") 812, was
signed by the Government, by Jordan himself, and by Ms. Shroff
on behalf of herself and Ms. Gatto.  Although the letter from
the defendant that was passed up to the Court later that day and
marked as Court Exhibit 6 referred to falsehoods in the
stipulation, defense counsel explicitly stated to the Court at
the time the letter was passed up that the defendant confirmed
he stood by the signed stipulation.

v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005) (citation omitted).
Rule 33 authorizes a district court to grant a new trial "if the
interest of justice so requires." Fed. R. Crim. P. 33(a).  A
motion for a new trial may be granted only "sparingly and in the
most extraordinary circumstances." United States v. Triumph
Capital Group, Inc., 544 F.3d 149, 159 (2d Cir. 2008) (citation
omitted).  The motion should not be granted "unless the trial
court is convinced that the jury has reached a seriously
erroneous result or that the verdict is a miscarriage of
justice." Id. (citation omitted).

On this motion to set aside the verdict or grant a new
trial, Jordan's new counsel contends principally that the jury's
verdict was not supported by sufficient evidence, that the
defendant's fundamental right to represent himself was violated,
that trial counsel was ineffective, that the trial was not
fairly conducted, and that the verdict was against the weight of
the evidence.  Counsel also attaches to his submission nearly
100 pages of documents that Jordan gave to him to be considered
on this motion.  These consist of an affidavit, several
exhibits, and a memorandum.  To his reply submission,
defendant's counsel has attached an additional 25-page
memorandum prepared by Jordan.  Along with the reply, Jordan's
counsel has also filed a motion for the District Judge's recusal
from this proceeding.  As described in detail below, each of the

defendant's challenges, as well as his motion for recusal, is
without merit.  The challenges and then the motion for recusal
are addressed in turn.

I. Sufficiency of the Evidence

A defendant who challenges the sufficiency of the evidence
to support his conviction "bears a heavy burden." United States
v. Bullock, --- F.3d ----, 2008 WL 5235838, at *2 (2d Cir. Dec.
17, 2008).  In deciding such a motion, the court must "view the
evidence in the light most favorable to the government and draw
all reasonable inferences in its favor." United States v. Lee,
--- F.3d ----, 2008 WL 5076677, at *7 (2d Cir. Dec. 3, 2008)
(citation omitted).  The evidence is considered "in its
totality, not in isolation, and the government need not negate
every theory of innocence." Id. (citation omitted).  Under Rule
29, a district court must affirm the conviction if "any rational
trier of fact could have found the essential elements of the
crime beyond a reasonable doubt." Bullock, 2008 WL 5235838, at
*2 (citation omitted).

Jordan argues that each of the five counts tried in October
should be dismissed for insufficiency of the evidence.  He,
however, offers no basis for his insufficiency challenge with
respect to Counts Four and Five, the witness tampering counts.
These counts were supported by irrefutable documentary evidence,
which was, in addition, corroborated by the testimony of, among

other witnesses, Dr. Mayer.  The defendant having failed to
identify any basis to set aside the verdict on these two counts,
the discussion will address the three threat counts.

On Count One, Jordan asserts that the evidence was
insufficient to support conviction on the first two of seven
specific threats quoted by the Government in a bill of
particulars.[24]  Count One charged a violation of 18 U.S.C. §
875(c), which provides in pertinent part: "Whoever transmits in
interstate or foreign commerce any communication containing any
threat to kidnap any person or any threat to injure the person
of another" shall be guilty of a crime.  18 U.S.C. § 875(c); see
United States v. Francis, 164 F.3d 120, 121 (2d Cir. 1999);
United States v. Sovie, 122 F.3d 122, 125 (2d Cir. 1997); United
States v. Malik, 16 F.3d 45, 51 (2d Cir. 1994); United States v.
Kelner, 534 F.2d 1020, 1023, 1027 (2d Cir. 1976).  The seven
threats alleged in the bill of particulars were made to Thenault
or her family when she was in Virginia and then in Great
Britain.  The first two threats were in telephone calls made by
the defendant to Thenault, Ms. Adams, and Ms. Dodson.  The
remaining five were quoted from facsimiles, text messages, and
an e-mail that were sent to Morean-Phillip and to Thenault.  The

---

[24] While Jordan purports to challenge the sufficiency of the
evidence for three of the seven threats, his discussion of the
threats actually concerns only the two orally communicated by
telephone.

32

jury charge also listed the seven threats,[25] and instructed the
jury that, to find the defendant guilty of Count One, it "must
unanimously agree on at least one threat identified by the
Government for Count One that satisfies each of the elements of
Count One."

"[T]he Supreme Court has held that a verdict should be
affirmed when two theories of an offense are submitted to the
jury and the evidence supports one theory but not the other."
United States v. Rutkoske, 506 F.3d 170, 176 (2d Cir. 2007)
(citing Griffin v. United States, 502 U.S. 46, 56-60 (1991)).
This is because, "[i]n such cases, courts assume that the
verdict is based on the valid theory."   Id.   Given that the
defendant does not challenge the sufficiency of the evidence on
the remaining five threats listed in support of Count One -- nor
could he reasonably do so in light of the documentary evidence
that established those threats at trial -- the jury's verdict on
Count One must be upheld.[26]

---

[25] Each juror was given a copy of the jury charge to follow along
as the Court read it to them and to keep during deliberations.

[26] The defendant contends elsewhere in his brief that, given the
"numerous 'acts' and 'prongs'" involved in the various counts, a
special verdict form should have been provided to the jury.  He
asserts that the Court's failure to do so "contributed . . . to
the unfairness of the trial and the unreliability of the
verdict."  "[I]n criminal cases . . . general verdicts are
strongly preferred."  United States v. Yakobowicz, 427 F.3d 144,
152 (2d Cir. 2005).  The Second Circuit has identified only
limited circumstances in which "it is not error for a district
court to use jury interrogatories," and those are principally

With respect to Count Two, Jordan asserts without explanation that "willfulness was not shown beyond a reasonable doubt."  Count Two charged a violation of 18 U.S.C. §§ 878, 112(a), and 1201(a)(4).  Section 878 provides that "[w]hoever knowingly and willfully threatens to violate sections 112 . . . or 1201" is guilty of a crime.  18 U.S.C. § 878; see United States v. Johnson, 14 F.3d 766, 768-69 (2d Cir. 1994) (discussing "willfully" requirement in the substantially similar context of 18 U.S.C. § 871); United States v. Compton, 428 F.2d 18, 21-22 (2d Cir. 1970)(same); United States v. Cooper, 865 F.2d 83, 85 (4th Cir. 1989) (requiring "true threat" for violation of 18 U.S.C. § 878).  Section 112(a) reads in pertinent part: "Whoever assaults, strikes, wounds, imprisons, or offers violence to [an] internationally protected person or makes any other violent attack upon the person . . . of such person, or . . . makes a violent attack upon his . . . private accommodation" is guilty of a crime.  18 U.S.C. § 112(a).  Section 1201(a)(4) makes it a crime to "unlawfully seize[] [or] confine[] . . . an internationally protected person."  18 U.S.C. § 1201(a)(4); see 18 U.S.C. § 1116(b) (defining "internationally

---

"when the information sought is relevant to the sentence to be imposed," United States v. Pforzheimer, 826 F.2d 200, 206 (2d Cir. 1987), and "in cases alleging multiple racketeering acts" based on different statutory violations.  United States v. Pimentel, 346 F.3d 285, 305 (2d Cir. 2003).  Neither circumstance exists here.

protected person" and incorporated by reference into 18 U.S.C.
§§ 112, 1201).

Count Two alleged that Jordan violated these statutes when,
during the period between December 2007 and up to and including
January 11, 2008, he knowingly and willfully threatened to
assault, wound, imprison, offer violence to, violently attack
the person of, or make a violent attack on the private
accommodation of Morean-Phillip, or knowingly and willfully
threatened to seize or confine Morean-Phillip.  The Government
provided a bill of particulars that quoted five specific threats
that Jordan communicated to Morean-Phillip or to Thenault by
facsimile, e-mail, or text message while Thenault was in London
with her aunt.  The jury charge explained that a threat is made
willfully "if the speaker intentionally makes a statement in a
context or under such circumstances wherein a reasonable person
would foresee that the statement would be understood by the
person to whom the speaker communicates it as a serious
expression of an intent to act as described in the threat."

The language of the threats at issue, which were shown to
the jury through documentary evidence, was unambiguous.  For
example, in one facsimile, the defendant wrote that "two
brothers hold hatred toward the former Attorney General of the
Republic of Trinidad and Tobago identified to be Glenda P.
Morean-Phillip," and "are now living in London awaiting right

opportunity to get at Morean-Phillip . . . . Have maybe two AK-
47 shipped Jamaica-Miami-UK via FedEx . . . .  My friend
believes they will wait and act when the opportunity arrives
both against Morean-Phillip and her family."  In another
facsimile sent to Morean-Phillip, Jordan wrote:

> You are to immediately apologize by telephone call to
> the offended party.  It is very likely that failure to
> do so will be regretted. . . .  [I]n order to be able
> To go about your life in a secure and comfortable
> manner, . . . and without the need albeit imperfect
> for increased security and overwhelming expense, you
> must prove that the young woman is safe, acting only
> of her own free will, and not being manipulated,
> controlled, or otherwise held against her own free
> will. . . .  Basically, world news that you will not
> like can occur, or you can be wise and diplomatic.

Given the context of these threats -- namely, that Thenault
had fled from Jordan to the official residence of her aunt
hoping to find safety -- and the explicit language that was
used, the evidence was more than sufficient for the jury to find
that a reasonable person would foresee that Morean-Phillip and
Thenault would understand the communications as a serious
expression of an intent to act as described in the threats.
Indeed, the swiftness and seriousness with which Morean-Phillip
and law enforcement responded to the threats corroborate such a
finding.[27]  The defendant's motion offers no basis to question a
finding of wilfullness.

_____

[27] Jordan's intent was further proven at trial by the spontaneous
utterances he made in the course of his January 11 arrest and

Finally, on Count Three, the interstate stalking charge, Jordan argues that the evidence was insufficient because it failed to show that Jordan intended to cause Thenault to fear harm to herself or members of her immediate family.  Rather, Jordan argues, he was only trying to convince Thenault to come back to him, and Thenault in fact indicated at times to Jordan that she wanted to return to him.

Count Three charged a violation of 18 U.S.C. § 2261A(2), which provides:

> Whoever with the intent,
>
> (A) to . . . injure, harass, . . . intimidate, or cause substantial emotional distress to a person in another State; or
>
> (B) to place a person in another State in reasonable fear of the death of, or serious bodily injury to--
>
>> (i) that person; or
>>
>> (ii) a member of the immediate family of that person,
>
> uses . . . any facility of interstate . . . commerce to engage in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of the death of, or serious bodily injury to, any of the persons

just described shall be guilty of a crime.  18 U.S.C. § 2261A(2); see 18 U.S.C. § 2266(8) (defining "State"); 18 U.S.C. § 2266(2) (defining "course of conduct"); 18 U.S.C.

---

processing.  Among other things, Jordan stated, "I knew I shouldn't have messed with her aunt, the ambassador."

§§ 219(2), 1365(h)(3) (defining "serious bodily injury" and incorporated by reference into 18 U.S.C. § 2261A(6)); 18 U.S.C. § 115 (defining "immediate family member" and incorporated by reference into 18 U.S.C. § 2261A(2)); United States v. Bell, 303 F.3d 1187, 1192 (9th Cir. 2002).  Count Three charged that Jordan violated this statute with respect to Thenault through his telephone calls to her during the time period that she was in Virginia.[28]

The jury was instructed that if it found "beyond a reasonable doubt that the defendant engaged in a course of conduct that caused Ms. Thenault substantial emotional distress or that placed her in reasonable fear" of the acts listed in the statute, it also had to determine

> whether the defendant did so knowingly and with the specific intention either (1) to injure, harass, intimidate, or cause substantial emotional distress to Ms. Thenault, or (2) to place Ms. Thenault in reasonable fear of her death or serious bodily injury or the death or serious bodily injury of a member of her immediate family.

The jury was further instructed that to find the defendant guilty it had to be "unanimous as to which type of knowledge and intent the defendant acted."

---

[28] Although the Indictment listed telephone calls, facsimiles, and e-mail messages, at trial the Government agreed -- due to the language of the statute specifying that the victim be in another "State" -- to narrow the scope of this count to the time period in which Thenault was in Virginia, as well as to limit the acts charged under Count Three to telephone calls.

In his challenge on Count Three, the defendant argues only that the evidence was insufficient to demonstrate that he intended to cause Thenault to fear harm to herself or members of her immediate family; he ignores entirely the alternative prong which requires intent to injure, harass, intimidate, or cause substantial emotional distress to another person.  The jury was presented with abundant evidence of the harassing and intimidating conduct Jordan undertook against not only Thenault but also members of her family.

The evidence at trial proved Jordan's conduct to be calculated and elaborate.[29]  The evidence of the false internet postings offering sex and housing at the Adamses' telephone number, as well as Thenault's testimony that Jordan told her while she was in Virginia that he would beat up her ex-boyfriend David Weller and later "had put him in the hospital,"[30] amply supported the inference that Jordan acted with the intent to cause Thenault substantial emotional distress and reasonable

---

[29] For instance, the FBI recovered a notebook from Jordan's apartment in which the defendant recorded the names, addresses, telephone numbers, and social security numbers he used in undertaking the harassment and threats against Thenault, Mr. and Ms. Adams, Ms. Dodson, and David Weller.  The jury was shown multiple pages from the notebook relevant to the specific communications the victims had received.

[30] As already described, Thenault's testimony was corroborated by David Weller himself.  In his calls to Weller, the defendant made specific references to Weller's apartment and to a particular doorman at the building.

fear of harm.  Such behavior was not consistent with a theory that Jordan merely wished in good faith to persuade Thenault to return to him.  Nor can a "motive" to get Thenault to return to him serve as a defense if Jordan also acted with the intention of causing Thenault substantial emotional distress or reasonable fear of the acts specified in 18 U.S.C. § 2261A(2).  Moreover, on the website SimoneThenault.com that he created, Jordan admitted to reacting to Thenault's departure by saying "angry" and "foolish" things to Thenault and her family members.  In sum, Jordan has not met his heavy burden in challenging the sufficiency of the evidence on the five counts, and his motion for an acquittal or new trial must be denied.

II. Right To Proceed <u>Pro Se</u>

Next, Jordan asserts that the Court violated his fundamental right to represent himself.  "A criminal defendant has a constitutional right to waive the right to assistance of counsel and present his own defense <u>pro se</u>, if the decision is made knowingly and intelligently."  <u>United States v. Oberoi</u>, 547 F.3d 436, 458 (2d Cir. 2008) (citation omitted).  But, "[t]he right to self-representation attaches only if it is asserted clearly and unequivocally."  <u>Wilson v. Walker</u>, 204 F.3d 33, 37 (2d Cir. 2000) (citation omitted).  Even "[o]nce asserted, . . . the right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned

40

one's request altogether." Id. (citation omitted).  However, a
defendant "is not deemed to have equivocated in his desire for
self-representation merely because he expresses that view in the
alternative, simultaneously requests the appointment of new
counsel, or used it as a threat to obtain private counsel." Id.
at 37 n.3 (citation omitted).  The Second Circuit has explained:

> The purpose of requiring that a criminal defendant
> make an "unequivocal" request to waive counsel is
> twofold.  First, unless the request is unambiguous and
> unequivocal, a convicted defendant could have a
> colorable Sixth Amendment appeal regardless of how the
> trial judge rules: if his request is denied, he will
> assert the denial of his right to self-representation;
> if it is granted, he will assert the denial of his
> right to counsel.  Second, the requirement of an
> unambiguous and unequivocal request inhibits any
> deliberate plot to manipulate the court by
> alternatively requesting, then waiving counsel.

Williams v. Bartlett, 44 F.3d 95, 100-01 (2d Cir. 1994)
(citation omitted).

"Assuming . . . that a defendant's request to proceed pro
se is informed, voluntary and unequivocal, the right of a
defendant in a criminal case to act as his own lawyer is
unqualified if invoked prior to the start of the trial." Id. at
99 (citation omitted).  "After trial has begun, a trial court
faced with such an application must balance the legitimate
interests of the defendant in self-representation against the
potential disruption of the proceedings already in progress."
Id. at 99 n.1.

41

Jordan's constitutional right to represent himself was not violated.  He never communicated, either before or during trial, a clear and unequivocal assertion of a desire to proceed pro se. To the contrary, Jordan repeatedly wrote that he was considering that decision, and each time the Court addressed such statements at conferences by informing the defendant of his rights in this regard; advising him that if he were to make that decision it would have to conduct an inquiry to ensure that his decision was knowing and voluntary; instructing the defendant to discuss the decision with his counsel and notify the Court through them of any decision to proceed pro se; offering to appoint independent CJA counsel to discuss the decision with the defendant as well; and warning Jordan that the trial date would not be moved a second time regardless of the defendant's decision.

When Jordan did request in his October 1 Motion that the Court address at that time any competency issues with respect to his ability to proceed pro se, the Court immediately contacted the parties to schedule a conference for the following day. Also on October 1, defendant's counsel relayed to the Court what appeared to be the defendant's first unequivocal decision to represent himself.  But, when the Court sought to address these issues at the conference on October 2, the defendant informed the Court that he did not want independent counsel appointed at

42

that time and that, in fact, he had not yet made the decision to proceed pro se.

The defendant's contention that his fundamental right to represent himself was invoked in this case is based principally on two submissions that were not received by this Court either before or during the trial.  The first is a letter ("New Letter") that the defendant provided to his current counsel and attached to his post-trial affidavit as, purportedly, the September 19 Letter he sent and the Court returned to him by an Order of September 19.  As explained in an Order of December 8, the New Letter is not the September 19 Letter received by the Court prior to the trial, and was first received by the Court with the December 5 motion for a new trial.[31]  None of the excerpts from the New Letter upon which defendant's counsel relies in making this motion were contained in the September 19 Letter.  This includes, most importantly, a purported request that new counsel be assigned to Jordan, or in the alternative, that the Court allow Jordan to represent himself.  Any

---

[31] In his reply, defense counsel abandons any argument that, based on the New Letter, the Court erred in not permitting the defendant to proceed pro se.  He adds, however, that the Court has now become a fact witness and should recuse itself.  The recusal motion is addressed below.

contentions based on the New Letter need not, therefore, be
considered further here.[32]

The second submission upon which the defense relies is the
October 17 Motion, or Document No. 74 as the defendant refers to
it.  As already described in detail, although this submission
was postmarked October 6, the first day of trial, it was not
received by this Court's Chambers until October 17.  The Court
provided the Government and the defendant's new counsel with a
copy of the submission at the conference on October 17, and it
reiterated that during the trial the Court had no clear
statement from the defendant that he wished to proceed pro se.

The October 17 Motion does not show that the defendant's
right to self-representation was violated.  The defendant was in
Court with his counsel every day of the trial, and yet at no
point did he raise this issue with the Court or his counsel, nor
did he notify his attorneys that he had sent this motion and had
not yet heard a response.  His silence was, moreover, contrary
to the promise in the October 17 Motion that he "shall orally
make the motion for self-representation."  Each time the Court

---

[32] In any event, even if Jordan made the statements contained in
the New Letter asserting his right to proceed pro se, the
assertion was waived when, at the October 2 conference, Jordan
informed the Court that he had not yet made the decision to
represent himself.  Moreover, at neither of the two conferences
held between August 27 and October 2 did the defendant assert
his right to self-representation or request that new counsel be
appointed.

received a submission from the defendant, it noted for the
parties the date of the submission, its postmark date, the date
on which it was received by the Pro Se Office if applicable, and
the date on which it was received by the Court's Chambers.   The
defendant was, therefore, well aware of the delays routinely
involved in this chain of events,[33] and could have anticipated a
similar delay, particularly since the defendant addressed the
mailing containing the October 17 Motion to the "Pro Se Clerk"
and not to the Court itself.[34]   In sum, no inquiry on the
defendant's decision to proceed pro se was conducted during the
trial because the Court never had an unequivocal statement from
the defendant on the matter.   The absence of an inquiry was not
-- as Jordan contends -- due to an unwillingness to disrupt the
trial.

Finally, Jordan asserts that, in light of his inquiries as
to a deadline for an application to proceed pro se, it was error
to refuse to provide him with a deadline or to explain that once

---

[33] While it is regrettable that the Pro Se Office and/or
docketing unit in the Clerk's Office did not forward each of the
communications to the Court more promptly, it is difficult to
fault them since this was not a pro se case and the defendant
was repeatedly instructed that he should communicate with the
Court through his attorneys.

[34] On this record, the Court must conclude either that the
defendant continued to vacillate on his decision after he mailed
the October 17 Motion, or that he wished to preserve an attack
on his anticipated conviction without foregoing the benefit of
being represented by counsel.

trial began his rights in this regard would be more limited.
Jordan cites no legal authority for the proposition that a court
should set a deadline for this decision, and indeed in other
passages in his submissions acknowledges that a defendant's
right to represent himself does not disappear with jury
selection.  Moreover, well ahead of the trial date the Court
instructed the defendant that he should consult with his counsel
regarding this decision, and it offered on at least two
occasions to appoint independent counsel for additional
consultation.  The defendant declined those offers, including
one made on the brink of trial.  For these reasons, Jordan's
claim that his constitutional right to represent himself in this
case was violated is denied.

III. Assistance of Counsel

    Under Strickland v. Washington, 466 U.S. 668, 688, 694
(1984), a defendant bears the burden of demonstrating that: "(1)
counsel's representation fell below an objective standard of
reasonableness; and (2) there is a reasonable probability that,
but for counsel's errors, the result of the proceeding would
have been different."  Contino v. United States, 535 F.3d 124,
128 (2d Cir. 2008).  The test has been described as "rigorous."
Parisi v. United States, 529 F.3d 134, 140 (2d Cir. 2008)
(citation omitted).

With respect to the first prong, "[t]o give appropriate deference to counsel's independent decisionmaking," courts should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 141 (citation omitted). "Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and even strategic choices made after less than complete investigation do not amount to ineffective assistance -- so long as the known facts made it reasonable to believe that further investigation was unnecessary." Id. (citation omitted).

On the second prong, "reasonable probability [is] one that undermines confidence in the outcome." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (citation omitted). The level of prejudice that the defendant must establish "lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case." Id. (citation omitted). If a defendant fails to show prejudice, the court "need not consider the objective reasonableness of counsel's actions." United States v. Guang, 511 F.3d 110, 120 (2d Cir. 2007) (citation omitted).

"[A]n evidentiary hearing is not held to afford a convicted defendant the opportunity to conduct a fishing expedition." United States v. Stewart, 433 F.3d 273, 306 (2d Cir. 2006) (citation omitted).  Where "it is not necessary to resolve the issues that might be the focus of an evidentiary hearing," a district court does "not abuse its discretion in refusing to conduct an evidentiary hearing."  Id. at 302 (citation omitted). In deciding whether a hearing is required, a court may rely "on the motion and the files and records of the case."  Chang v. United States, 250 F.3d 79, 84 (2d Cir. 2001) (citation omitted) (quoting standard in the context of petitions brought under 18 U.S.C. § 2255).  The burden is on the defendant to identify with specificity material facts in dispute, the resolution of which requires a hearing:

> In general, an evidentiary hearing need not be granted as a matter of course and must be held only if the moving papers allege facts with sufficient definiteness, clarity and specificity to enable the trial court to conclude that relief must be granted if the facts alleged are proved.  General and conclusory factual allegations which are based upon mere suspicion or conjecture, however, will not suffice to necessitate a hearing.  Moreover, if facts urged in support of a hearing would not entitle the moving party to relief as a matter of law, no evidentiary hearing is required.

Gentile v. County of Suffolk, 926 F.2d 142, 148 (2d Cir. 1991) (citation omitted) (quoting standard from criminal cases with approval).

Jordan claims that his trial counsel were ineffective principally because they compelled him to accept the testimonial stipulation for Ms. Foss; they decided not to contest the issue of identity; they failed to prepare him adequately to testify and would have erroneously introduced evidence of a prior conviction that had been excluded by the Court; they failed to call certain witnesses he had identified for his defense; and, generally, they did not consult sufficiently with the defendant in preparation for the trial. Jordan contends that an evidentiary hearing should be held to address these issues, and that the Court should order the production of the Bureau of Prisons ("BOP") logbooks so that the history of counsel's visitation with Jordan can be properly assessed. Each of these contentions fails to satisfy the strict standard for ineffective assistance.

A. Foss Stipulation

First, Jordan contends that he was forced to accept the stipulation regarding Ms. Foss's testimony because defense counsel would not listen to him regarding material that could be used to cross-examine her. As described above, Count Four, which charged Jordan with using intimidation and threats with the intent of preventing or interfering with Thenault's testimony, rested in part on an "affidavit" that Jordan created and sent to Thenault purporting to be from his ex-wife, Ms.

Foss.  The Government intended to call Ms. Foss as a trial
witness to explain that she had not signed the affidavit and
that she did not agree with its contents.  Defense counsel and
the Government negotiated a stipulation that made her testimony
unnecessary.

The advantage of a stipulation to the defense was obvious.
The jury would not see a second woman with whom Jordan had had a
severely troubled relationship and who might appear sympathetic,
and it would not hear the details of that relationship, which
would in all likelihood be admissible if cross-examination
challenged the credibility of Ms. Foss's denials that the
affidavit reflected her views.  The possibility of a stipulation
in lieu of Ms. Foss's testimony was under discussion with the
defendant from September 25 to October 14.  When the defendant
indicated on October 14 that he would not sign the stipulation,
Ms. Foss flew into town and arrived at the courthouse prepared
to testify the next day.  Then, on the morning of October 15,
defense counsel informed the Court that the defendant had signed
the Foss stipulation.  Although letters from the defendant that
were handed to the Court that day and marked as court exhibits
expressed reservations about the Foss stipulation, Jordan
represented to the Court that he stood by the stipulation he had
signed just hours earlier.  Ms. Foss was at the courthouse and
ready to testify.  If Jordan had any reservations about the

stipulation, he was free to reject it and face Ms. Foss's testimony instead.

Jordan claims that defense counsel would not listen to him regarding material that could be used for Ms. Foss's cross-examination.  But, he fails to identify that information.  There is no basis to find, therefore, that the failure of defense counsel to consider the effectiveness of a particular line of cross-examination effectively deprived Jordan of the option of refusing to execute the stipulation.  Indeed, it was sound trial strategy for counsel to work out a testimonial stipulation with the Government and to advise their client as to their belief that such a stipulation was in his best interest.  "[T]rial decisions to offer or stipulate to certain evidence . . . are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so."  United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (citation omitted).

Jordan has also failed to show that he was prejudiced by the purported failure to consider this unidentified line of cross-examination.  Jordan's complaint seems to be that the stipulation was damaging to him.  But the choice was not between the stipulation and nothing at all; it was between the limited stipulation and Ms. Foss's live testimony, with the very substantial risk that that testimony would have been far more

damaging to Jordan.  Thus, the defendant's claim of ineffective
assistance of counsel on the basis of the stipulation is
denied.[35]

B. Authorship of the Communications

Jordan also complains that his counsel decided not to
contest his authorship of certain of the communications at issue
in this trial.  He identifies three facsimiles:  The first is
GX 71, a facsimile that reads in part: "3-4 men . . . living in
London awaiting right opportunity to get at Morean-
Phillip. . . .  Have maybe two AK-47 shipped Jamaica-Miami-UK
via FedEx."  The second facsimile, GX 76, refers to a telephone
conversation between Jordan and Morean-Phillip, and demanded
that she "immediately apologize by telephone call to the
offended party" or "failure to do so will be regretted."  It
also asserted that, for Morean-Phillip "[t]o go about [her] life
in a secure and comfortable manner . . . without the need albeit
imperfect for increased security," she would have to prove that
her niece was safe and "acting only of her free will," or else

---

[35] Elsewhere in his submission, Jordan contends that statements
in the Foss stipulation describing Ms. Foss's marriage to Jordan
as "a living nightmare" during which she "went to several
shelters to escape from the defendant," contributed to the
unfairness of Jordan's trial.  As already described, Jordan was
free to reject the stipulation -- and these statements -- and
face Ms. Foss's live testimony instead.  In any event, these
statements were made to express Ms. Foss's denial of, among
other things, the assertion in the fraudulent affidavit that
"[t]he 5 years of our marriage were the happiest in my life."

"world news that you will not like can occur."  The third
facsimile, GX 70, contained instructions on how Thenault could
pick up her property, and described scandalous information about
Morean-Phillip that "[e]mbassies around the world . . . are all
being made aware."  Jordan also contends that he did not want to
concede that he was the author of the internet and newspaper
postings about which David Weller testified.

Although Jordan's challenge seems to suggest otherwise, no
stipulation or other admission of authorship was ever entered
into by the defense for any of these communications.  Instead,
defense counsel did not actively contest that Jordan was the
author of the communications sent to Thenault and Morean-
Phillip.  They did, however, make a limited effort to challenge
that he was the author of the postings concerning Weller.[36]  In
any event, Jordan's challenge fails to satisfy the rigorous
Strickland test.

With respect to the first prong, counsels' decision was
reasonable and strategically sound, particularly in light of a
preliminary ruling by the Court that if identity were contested,
testimony and other evidence relating to the defendant's
harassment of a female law firm associate would be admissible.

---

[36] On cross-examination, Mr. Weller testified that he did not
know who was posting the advertisements, but he "assumed they
were Joe" because "[t]hey were happening at the same time [as]
the phone calls from Joe."

53

Jordan met the law firm associate at the same bar where he met
Thenault, and only weeks before Jordan began dating Thenault;
after the associate rebuffed Jordan's advances, the harassment
of the law firm associate was conducted in substantially the
same manner and through the same mechanisms as Jordan's stalking
and harassment of Thenault and her family later that same year.

Setting aside the likelihood that evidence involving the
law firm associate would be admitted, counsel's decision was
also reasonable in light of the extensive corroboration of the
defendant's authorship of the communications.  For example,
copies of the text for GX 70 and GX 71 were found on Jordan's
computer and received into evidence.  There was evidence that
the mailing address for Mr. Weller's cell phone bills had been
changed to the defendant's mailing address.  Copies of
photographs used in the internet postings concerning Weller were
seized from the defendant's apartment.

For this same reason, Jordan also fails to satisfy the
second Strickland prong.  He offers absolutely no explanation to
suggest how he could have effectively disputed the Government's
multifaceted evidence of his authorship of these four items.
Thus, Jordan's assertion that counsel was ineffective for
failing to contest the issue of identity at trial is merely
conclusory, and he fails to establish any probability that, but
for counsels' decision not to contest authorship, the outcome at

trial would have been different.  The claim must, therefore, be denied.

    C. The Defendant's Right To Testify

    A criminal defendant's "right to testify is personal and, therefore, can be waived only by the defendant." Chang, 250 F.3d at 82 (citation omitted).  Accordingly, "regardless of strategic considerations that his lawyer concludes weigh against such a decision, a defendant who wishes to testify must be permitted to do so." Id. at 83 (citation omitted).  Defense counsel have a duty to inform their clients of their right to testify "and to ensure that clients understand that the ultimate decision belongs to them, not counsel." Id.  This "burden of ensuring that the defendant is informed of the nature and existence of the right to testify is a component of the effective assistance of counsel." Id. (citation omitted).  At the same time, "counsel has . . . the professional duty[] to advise his client of the benefits and pitfalls of a decision to take the stand on his own behalf." Brown v. Artuz, 124 F.3d 73, 78 (2d Cir. 1997).  To establish a claim of ineffective assistance of counsel based on a violation of his right to testify, a defendant must satisfy the two-pronged Strickland test, including showing a reasonable probability that his testimony "would have altered the outcome at trial." Rega v. United States, 263 F.3d 18, 21 (2d Cir. 2001).

### 1. Jordan's Awareness of His Right To Testify

On this motion, Jordan makes no suggestion that he was not informed it was his right to testify and his decision to make. Nor does he allege that counsel did not give him their best advice as to whether or not he should take the stand.  Indeed, Jordan requested on October 15 to consult with independent CJA counsel regarding his right to testify, and the Court immediately undertook to make that appointment.  After meeting with the defendant that morning, the CJA attorney, Mr. Kratt, reported to the Court that Jordan was aware of his right to testify or not, and that Jordan would inform his trial counsel of his decision on the matter.  The Court also gave the defendant detailed instructions regarding his right to testify. It is, thus, clear from the record in this case that Jordan was thoroughly aware of his right to testify, and that the ultimate decision on the issue lay with him.

### 2. Jordan's Allegation of Inadequate Preparation

Rather than asserting that he was not fully aware of his right to testify, Jordan complains that he did not testify because he was discouraged from doing so by counsel's failure to prepare him adequately.  He identifies a single deficiency in this regard.  He asserts that there was a reference to one of his prior convictions in Ms. Shroff's written outline for his direct testimony, specifically a 1992 conviction for assault

with a dangerous weapon.[37]   Jordan asserts that he saw this error

in Ms. Shroff's outline on the morning of October 15, when Ms.

Gatto "was involved in colloquy regarding the admissibility of

certain prosecution evidence."   He asserts further that during a

break in the testimony of FBI Agent Waller on October 15, he

"attempted to discuss this problem and other matters with Ms.

Shroff, who then became agitated."[38]   He claims that he,

therefore, did not have a chance to discuss the issue with his

counsel and he was forced "to make the decision about testifying

. . . in the midst of a severe breakdown in communications

with[] defense counsel," "not having been given enough time with

counsel to deal with this situation, and . . . with a complete

loss of confidence in defense counsel."   Jordan asserts that his

testimony was "necessary" for his defense in two ways: to rebut

allegations of abuse and verbal threats and to show that other

acts were not "willful."

These allegations do not make out a claim for ineffective

assistance of counsel.   To carry his burden of demonstrating

prejudice under the second Strickland prong, Jordan must

---

[37] The Court had ruled on the morning of October 6 that, while
two other 1992 convictions for kidnapping and conspiracy to
commit murder could be used to impeach the defendant, use of the
assault with a dangerous weapon conviction would not be
permitted.

[38] Jordan adds that his attorney asked that he be removed from
the courtroom until the testimony resumed, but that the marshal
refused.

identify what he wished to state on the stand and how that would have affected the outcome.  This Jordan has failed to do, and understandably so.  As the defense itself acknowledged in its motion in limine to preclude cross-examination on the defendant's prior convictions, much of the evidence at trial was documentary.  Had Jordan testified, therefore, he would have been confronted with many facts he simply could not credibly dispute.  It is thus unsurprising that Jordan has not been able to articulate why it would have been in his interest to take the stand.  Jordan's conclusory assertion that his testimony was "necessary" is insufficient to show a reasonable probability that his testimony would have altered the outcome at trial.[39]

In any event, Jordan's assertion that his counsel did not consult with him adequately to prepare his testimony is belied by the trial record.  Jordan asserts that he sent to his trial counsel on September 10 an 80-page timeline as well as a shorter 20-page "Abbreviated Time Line" which indicated, based to some extent on discovery material, what Jordan "anticipated testifying to as of September 2008."  Jordan was aware on October 8, just before the trial entered a five-day break, that

---

[39] Given that Jordan's prior convictions for kidnapping and conspiracy to commit murder would have been admitted had the defendant chosen to testify, the possibility that Ms. Shroff would have also questioned Jordan about the prior conviction for assault with a dangerous weapon could not have changed the jury's verdict.

the Government had only a couple more witnesses and that it expected to rest shortly after the trial resumed the following week.  One or both of his attorneys visited Jordan twice during the five-day break and spoke with him several more times over the telephone.  By his own admission, Jordan was given a written outline of the questions his attorney planned to ask him during his direct testimony.  It is apparent, therefore, that defense counsel and Jordan had prepared for his testimony, and that they had consulted many times during the relevant time period.

Moreover, Jordan's account of his failed attempt to communicate with his counsel on October 15 about the single error in Ms. Shroff's outline is not supported by the trial record.  Jordan asserts that he noticed the error during a colloquy regarding certain evidence.  The colloquy that Jordan references occurred early on the morning of October 15, before the jury was brought into the courtroom.  The Government reported at that time that it would be resting that morning and the Court scheduled the charging conference for 1:30 p.m. Defense counsel also relayed Jordan's request to speak with separate counsel regarding his right to testify and "other matters."  Eventually, Ms. Gatto presented evidentiary objections to certain Government exhibits that were being admitted through the testimony of the FBI Agent that morning.

Jordan asserts that he tried to discuss the error with Ms. Shroff during the break in the agent's testimony.  The only break in Agent Waller's testimony came at mid-morning, when the Government had finished its direct examination.  During that mid-morning break, Jordan met with CJA attorney Mr. Kratt.

After the recess, Ms. Gatto cross-examined the agent.  When that examination concluded and the Government's final witness also completed her testimony, the jury was excused for their luncheon recess.  The Court observed that the defendant and Ms. Shroff had been consulting with each other and inquired whether the defendant wished to present the Court with a letter to which Mr. Kratt had referred when reporting to the Court earlier in the day on his conversation with the defendant.  Ms. Shroff then provided a detailed oral recitation of complaints that Jordan had given her about his attorneys and that he wished her to convey to the Court, including "that Mr. Jordan more vehemently would like us to reargue to the Court its prior ruling on what of his prior convictions would be admitted . . . as evidence in the event he were to take the witness stand."  After the Court responded to the recitation, the defendant asked that his attorneys hand his letter to the Court.  It was marked as Court Exhibit 6.

During the luncheon recess that followed, the defendant and defense counsel received the proposed jury charge.  In addition,

the defendant presented another lengthy missive to the Court, which was marked as Court Exhibit 8 during the conference on the charge.  At the conclusion of the discussion of the charge, the Court responded to the issued raised by Court Exhibit 6, and Ms. Shroff reported that "my co-counsel and I have consulted with Mr. Jordan and he informs me at this time that he does not intend to take the stand."

This record of events on October 15, and the contents of Court Exhibits 6 and 8, indicate that the reference to the conviction in the outline for the defendant's direct testimony played no role in the defendant's decision not to testify. There is no reference to the conviction or the outline for his direct testimony in either letter that he gave the Court that day.  Moreover, Jordan consulted with Ms. Shroff at length that morning, and gave her a lengthy list of complaints about his counsel to convey to the Court.  That list did not include any reference to the error about the conviction.  Finally, there is no evidence that Jordan discussed this issue with Mr. Kratt, Ms. Gatto, or the defense team's paralegal, all of whom were with him that morning.

The conclusion is inescapable that Jordan has latched onto this single error in a detailed outline prepared by his trial attorney for his direct testimony to create a legal issue to undermine his conviction.  Through his communications to the

Court and the intricate timelines he prepared for his attorneys,
Jordan showed himself to be -- both before and throughout his
trial -- fervently immersed in his defense and persistent in all
of his efforts.  It is, therefore, simply not credible that
Jordan could not and did not communicate a significant concern
that he had regarding his counsel's written outline.

    D. Proposed Defense Witnesses

    Jordan points to eleven witnesses that he had identified in
support of his defense, and he complains that his counsel failed
to call these individuals to testify at trial.  In applying the
Strickland test, courts should be "especially deferential to
defense attorneys' decisions concerning which witnesses to put
before the jury."  Greiner v. Wells, 417 F.3d 305, 323 (2d Cir.
2005).  "The decision not to call a particular witness is
typically a question of trial strategy," and, therefore,
"counsel's decision as to whether to call specific witnesses --
even ones that might offer exculpatory evidence -- is ordinarily
not viewed as a lapse in professional representation."  Id.
(citation omitted).

    Jordan lists in his affidavit the eleven witnesses he had
proposed for his defense and describes the testimony each would
have provided.  Included in this list are two people to whom
Jordan had introduced Thenault because they might have been in a
position to assist Thenault in furthering her career; several

people who witnessed Thenault and Jordan together at bars or
restaurants; one individual who drove Jordan to Ms. Dodson's
home; unidentified officers from a Queens precinct who told
Jordan in December 2007 that he should not go to Ms. Dodson's
home to pick up his belongings without them; and two women whom
Jordan had been seeing or dating in December 2007 and January
2008.  Jordan also lists Thenault's former husband Frederick.
According to Jordan, Frederick and Thenault had accused each
other of domestic violence, Frederick knew that Thenault had
previously received medical treatment for various problems, and
he had information about the nature of Thenault's relationship
with Weller.

        Jordan does not provide affidavits from any of these
individuals setting forth the testimony they would have
provided.  In any event, of the eleven witnesses that Jordan
identifies, only two had any relevance to the crimes charged:
Dr. Mayer, who the Government called to testify and whose
testimony was quite damaging to Jordan; and Munther Nushiwat, to
whom Jordan purportedly showed text messages he received from
Thenault while she was in Virginia in December 2007.  Jordan
makes no showing that Nushiwat had any information to add that
was not thoroughly explored during the cross-examination of
Thenault.  Thus, Jordan offers no reason to conclude that his
counsel's decision not to call any of the witnesses he listed

reflected anything but sound trial strategy, and his claim of ineffective assistance on this basis must be denied.

E. Consultation with Jordan

Finally, Jordan contends that counsel failed to consult with him adequately.  Jordan has not shown that there is any reason to find that he has been provided ineffective assistance of counsel based on a failure to consult with him.  Jordan was thoroughly informed about the Government's evidence against him and deeply engaged in all of the proceedings.  His attorneys repeatedly demonstrated a mastery of the facts and their careful analysis of the legal issues.  To the extent Jordan has been able to identify any particular deficiency in his counsel's performance, that allegation is addressed in this Opinion.[40]  His

---

[40] Jordan identifies several additional deficiencies, none of which merits further examination.  He claims that counsel were ineffective for failing to assist him in cooperating with the FBI on matters unconnected to this case.  His related allegation that his cooperation was obstructed by his counsel's conflict of interest is baseless.

Jordan also complains that his counsel failed to file a motion to sever Counts One to Three from the two witness tampering counts.  These counts were properly joined, and any such severance motion would have been denied.  Finally, Jordan asserts that his counsel should have moved for the suppression of letters addressed to Thenault that were obtained by the FBI from Ms. Nestlebush and Dr. Mayer.  Ms. Nestlebush and Dr. Mayer had received the letters from the defendant, and his Fourth Amendment rights were not violated when they provided those letters to the FBI.  The defendant's submissions on this motion have been carefully reviewed and any issue requiring discussion has been addressed in this Opinion.

request for a hearing to explore the nature and extent of the history of his communications with his attorneys is denied.[41]

IV. Trial Fairness

Jordan identifies several reasons that he did not receive a fair trial.  These include that the Government made certain improper remarks in its opening and closing statements; that David Weller's testimony was overly prejudicial; that Jordan was convicted by jurors who had expressed fear of him; that the jury instructions on Count Three and on Counts Four and Five were improper; and that the jury rendered its verdict on Count Three before receiving an answer to a question it had asked about the conduct that was at issue.  Each of these objections is addressed in turn.  The remaining arguments that Jordan raises in connection with the fairness of his trial have already been addressed and rejected above.

A. The Government's Opening and Closing Remarks

Jordan's first contention concerning the fairness of his trial focuses on the statements made by the Government in its opening and closing remarks.  A court assessing allegations of prosecutorial misconduct should consider "the severity of the misconduct, the measures adopted to cure it, and the certainty

---

[41] It is unnecessary to obtain the BOP records of attorney visits with Jordan to resolve this motion.  Those records will be obtained, however, to ensure their availability should a need to consult them arise in the future.

of conviction in the absence of the misconduct."  United States
v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007) (citation omitted).
"The government has broad latitude in the inferences it may
reasonably suggest to the jury during summation," and
"[i]mproper summation statements violate a defendant's due
process rights only if they cause substantial prejudice to the
defendant."  United States v. Edwards, 342 F.3d 168, 181 (2d
Cir. 2003) (citation omitted).  A new trial is appropriate "only
when the statements, viewed against the entire argument before
the jury, deprived the defendant of a fair trial."  United
States v. Bermudez, 529 F.3d 158, 165 (2d Cir. 2008) (citation
omitted).

 Jordan was not deprived of a fair trial based on the
Government's statements in its jury addresses.  He complains
that -- even though no sexual abuse was charged -- the
Government opened by stating that the case was "about physical,
psychological and sexual abuse," and referred to rape or sexual
abuse four times.  He also points to the Government's
description that Jordan bound Thenault's hands with a wire
hanger and then beat her, whereas the evidence at trial showed
only that the defendant threatened to bind Thenault's hands with
the hanger when he beat her.

 Jordan's physical and psychological abuse of Thenault was
inextricably linked to the charged conduct.  The Government's

statements describing the case as being about abuse were not improper and were amply supported by the trial evidence.  Jordan has failed to show that the difference between threatening to use the hanger and using the hanger would be material to the jury or that the prosecutor lacked a good faith basis to anticipate that Thenault would testify as he described to the jury.[42]

With respect to the Government's summation, Jordan protests that the Government referred to him as "the face of evil," and called him a "convict" who had "hurt people before."  None of these statements was the prosecutor's characterization of the defendant.  Each was a reference to trial testimony, including recitations of what Jordan had told Thenault of his past.  The jury was, in any event, repeatedly instructed that anything said by counsel -- for example, in opening statements or in closing arguments -- was not evidence.

B. David Weller's Testimony

Jordan complains that the testimony by David Weller "was so prejudicial that defense counsel in summation referred to what Mr. Jordan did as 'awful, horrible, and maybe even a crime.'"  Rule 403, Fed R. Evid., permits the exclusion of relevant

---

[42] Thenault testified that "it just continued throughout the night where he got a hanger to tie up and also some tape which he threatened to use and it just kept going like that all night."

evidence "if its probative value is substantially outweighed by
the danger of unfair prejudice." Fed. R. Evid. 403 (emphasis
added). "The term 'unfair prejudice,' as to a criminal
defendant, speaks to the capacity of some concededly relevant
evidence to lure the factfinder into declaring guilt on a ground
different from proof specific to the offense charged." United
States v. Elfgeeh, 515 F.3d 100, 128 (2d Cir. 2008).

Jordan has not shown that Weller's testimony unfairly
prejudiced him. It was admitted as inextricably intertwined
with the charged criminal conduct. "[E]vidence of uncharged
criminal conduct is not evidence of 'other crimes, wrongs, or
acts' under Rule 404(b) if that conduct is inextricably
intertwined with the evidence regarding the charged offense."
United States v. Quinones, 511 F.3d 289, 309 (2d Cir. 2007)
(citation omitted). "In such circumstances, the uncharged crime
evidence is necessary to complete the story of the crime on
trial and, thus, appropriately treated as part of the very act
charged, or, at least, proof of that act." Id. (citation
omitted).

Before trial, the defendant sought to preclude David
Weller's testimony through a motion in limine pursuant to Rule
404(b). The Court ruled that Weller would be permitted to
testify because the conduct against him was "highly probative,"
"part and parcel of the conduct that underlies the crimes

charged," and "inextricably intertwined" with it.  As the Court
explained, "[t]he harassment . . . occurred both before and
during the time that the victim fled from the defendant and it's
therefore contemporaneous with the threatening activity that is
the subject of Counts One and Three, and it's absolutely
relevant . . . to the defendant's intent, which is an element of
Count Three."  Further, the Government had proffered that the
evidence at trial would show "that the defendant told the victim
of threats to her boyfriend and of harassing conduct, and the
fact that he actually engaged in [the] harassing conduct makes
it more likely that the defendant did say those things to the
victim."

     The evidence at trial did in fact show that, while Thenault
was in Virginia, Jordan told her, among other things, that he
had put Weller in the hospital.  In light of the evidence
presented at trial, Jordan offers no basis to conclude that
David Weller's testimony was <u>unfairly</u> prejudicial.  Thus, for
the reasons already stated on the record, the admission of David
Weller's testimony is not cause for a new trial and Jordan's
objection to it was properly denied.

     C. Jurors' Fear

     Jordan claims that his trial was unfair because, a day
before deliberations began, two jurors expressed fear of the
defendant to the Courtroom Deputy and within earshot of several

other jurors.  Rule 24(c), Fed. R. Crim. P., vests a trial court
with "broad discretion to replace jurors at any time before the
jury retires for deliberations."  United States v. Agramonte,
980 F.2d 847, 850 (2d Cir. 1992).  "A district court's
investigation of juror misconduct or bias is a delicate and
complex task," and, therefore, "a trial judge has broad
flexibility in such matters, especially when the alleged
prejudice results from statements by the jurors themselves."
United States v. Peterson, 385 F.3d 127, 134 (2d Cir. 2004)
(citation omitted).  A deferential standard of review applies
"because the trial judge is in a unique position to ascertain an
appropriate remedy, having the privilege of continuous
observation of the jury in court."  Id. (citation omitted).

The incident to which Jordan refers occurred as the jurors
were leaving to go home at the end of trial proceedings on
October 15, after the close of evidence and when the Court had
already read to the jurors a substantial portion of the jury
charge, including all of the elements of the charged offenses.
As the Court described to counsel the following morning, within
earshot of other jurors two of the jurors indicated to the
Courtroom Deputy "that they were concerned about the defendant
having their personal information.  They noticed that he writes
a lot and they asked if he would be keeping the papers that he
has had with him during the trial."

The defendant moved for a mistrial and alternatively requested that each juror be individually interviewed to determine whether he or she could be an impartial juror.  The application for a mistrial was denied.  After consulting with the parties about what should be said to the jury, the Court brought in the jury and began the morning by addressing the prior night's incident with them.  It stated that it knew "of no reason, whatsoever, that any of you should have any concern" about the defendant having some personal information about you. It reviewed for them in detail the principles regarding the presumption of innocence and the Government's burden of proof, and reminded them that jurors should base their decisions solely on the evidence and cannot "be swayed by bias or prejudice or fear or favor for or against the Government or for or against the defendant."  The Court then asked each juror to reflect on whether there was anything they wanted to discuss at sidebar or "to say that you think it would be better for you not to be a juror in this case."  As of that time, there were five alternate jurors available to deliberate.

The Court asked the two jurors who had made the remarks at issue to speak individually with the Court and counsel at sidebar.  Each juror stated without hesitation that she had no doubt about her ability to serve as a fair and impartial juror

in this case.  No other juror indicated that he or she wished to speak with the Court at sidebar.

Jordan has not objected to any passage in the Court's lengthy discussions of this issue with the jury or to any procedure that the Court employed to address this issue.  As the Court observed on the record, throughout the trial the jurors showed themselves to be "very diligent," attentive, and "very dedicated."  In light of those observations and the unequivocal responses given by the jurors in response to the Court's inquiries, it was apparent that they were not swayed by fear and that their verdict was based solely on the evidence.  Jordan's claim of unfairness on this basis is, therefore, without merit.

D. Jury Charge

Jordan asserts that the jury instruction on Count Three, which charged a violation of 18 U.S.C. § 2261A(2), was improper because it permitted the jury to convict Jordan of the interstate stalking charge for "'acts' as minor or trivial" as Jordan twice returning a telephone call from Thenault or calling her twice without the telephone calls "going through."  He also contends that the jury was improperly instructed on the meaning of "attempt" under Counts Four and Five, the witness tampering counts.  Both claims are without merit.

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the

jury on the law," and "an erroneous instruction, unless
harmless, requires a new trial."  United States v. Hassan, 542
F.3d 968, 987 (2d Cir. 2008) (citation omitted).  "An error is
harmless only if it is clear beyond a reasonable doubt that a
rational jury would have found the defendant guilty absent the
error."  Id. (citation omitted).  Challenged language in a jury
charge is not reviewed "in isolation," but instead the charge is
considered "in its entirety to determine whether, on the whole,
it provided the jury with an intelligible and accurate portrayal
of the applicable law."  United States v. Shamsideen, 511 F.3d
340, 345 (2d Cir. 2008) (citation omitted).

The specific instruction to which Jordan appears to be
objecting with respect to Count Three is the definition of the
term "course of conduct," to wit, "[a] course of conduct is a
pattern of conduct composed of two or more acts, evidencing a
continuity of purpose.  Each use of the telephone constitutes a
separate act."  The first part of this instruction is a direct
quotation from the statute, which defines "course of conduct"
for the purpose of the stalking statutes at 18 U.S.C. § 2266(2).
The second part informed the jury that one telephone call cannot
constitute multiple acts, such as the "act" of locating the
telephone number and then, separately, the "act" of dialing the
number.  See Bell, 303 F.3d at 1192 ("[T]he preparation and

sending of the . . . fax should [not] be considered separate acts").

Regardless, Jordan's challenge disregards entirely the other instructions provided for Count Three.  The charge listed three elements, each of which had to be found beyond a reasonable doubt in order for the jury to convict Jordan.  The first element required the Government to prove that, during the time period when Thenault was in Virginia, Jordan "used a facility of interstate commerce to engage in a course of conduct that (1) caused substantial emotional distress to Ms. Thenault, or (2) placed her in reasonable fear of death or serious bodily injury either for herself or a member of her immediate family." The second element required the Government to prove beyond a reasonable doubt,

> That in doing so, the defendant acted knowingly and with the intent
>
> (1) to injure, harass, intimidate, or cause substantial emotional distress to Ms. Thenault, or
>
> (2) to place Ms. Thenault in reasonable fear of her death or serious bodily injury or the death or serious bodily injury of a member of her immediate family.

The charge further provided that, to find Jordan guilty, the jury had to find that Jordan acted with the "specific intention" to cause the wrongs described in either of these prongs, and that the jury had to be "unanimous as to which type of knowledge

74

and intent the defendant acted."  Thus, had the jury found that Jordan's "course of conduct" consisted of "minor or trivial" acts such as returning telephone calls or attempting to dial Thenault's telephone number without success, it could not have concluded that the course of conduct satisfied each of the elements of the crime.  Viewed as a whole, therefore, the instructions given on Count Three properly conveyed the law to the jury, and Jordan's challenge to these instructions is without merit.

With respect to the attempt instruction for Counts Four and Five, Jordan asserts that it was improper because it did not require that the jury find "dangerous proximity to the criminal end."  He cites United States v. Andrello, 9 F.3d 247 (2d Cir. 1993), which explains that under the New York Penal Code, "a conviction for attempt is proper only if the defendant has carried the project forward within dangerous proximity to the criminal end to be attained."  Id. at 249 (citation omitted).

In the federal context, "[t]he standard for establishing a criminal attempt is well settled":

> In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant had the intent to commit the crime and engaged in conduct amounting to a "substantial step" towards the commission of the crime.  For a defendant to have taken a substantial step, he must have engaged in more than mere preparation, but may have stopped short of the last act necessary for the actual commission of the substantive crime.

United States v. Douglas, 525 F.3d 225, 249 (2d Cir. 2008)
(citation omitted).  In accordance with this standard, the jury
at Jordan's trial was instructed that "[a] defendant attempts to
intimidate, threaten, or corruptly persuade another person if he
acts with the intent to do so and his conduct constitutes a
substantial step towards committing the crime.  A 'substantial
step' requires more than mere preparation."  Because the crimes
at issue -- violations of 18 U.S.C. § 1512(b) -- were federal,
the instruction given was proper, and no mention of "dangerous
proximity" was necessary.

    E. Unanswered Jury Note

    Jordan complains that the jury did not wait for answers to
its questions before reaching a verdict.  Specifically, he
speculates that the jury may have convicted Jordan on Count
Three based on his internet postings, "disregarding the
instruction that this count was limited to telephone use."  The
jury note to which Jordan appears to refer was marked as Court
Exhibit 12 and asked, "Is Internet posting considered interstate
commerce (Craig's List)?"  The Court suggested to counsel that
it would respond that "the only communications that are at issue
with respect to Count Three are telephone calls," and the
parties had no objection.  Before the jurors could be brought
into the courtroom to receive answers to this jury note -- which
had been received at 2:42 p.m. -- and an earlier note, however,

the jurors notified the Court at 3:33 p.m. that they had reached
a verdict.

Jordan cannot succeed on this challenge.  Jordan does not
dispute that the jury charge properly limited the acts charged
under Count Three to telephone calls.  The Court must,
therefore, assume that the jury followed these instructions.
See Britt v. Garcia, 457 F.3d 264, 272 ("It is a fundamental
proposition that a jury is presumed to follow the instructions
of the trial judge." (citation omitted)).  Indeed, that the jury
returned a verdict so soon after inquiring about the internet
postings indicates that it found Jordan guilty on Count Three
based on the telephone calls alone, and that it did not need to
wait for an answer to its note.

V. Weight of the Evidence

Finally, Jordan asserts without explanation that even if
the verdict is found to have been supported by sufficient
evidence, a new trial is necessary because the verdict was
against the weight of the evidence.  "The weight [of the
evidence] is a matter for argument to the jury."  United States
v. Florez, 447 F.3d 145, 155 (2d Cir. 2006) (citation omitted).
"In considering whether to grant a new trial, a district court
may itself weigh the evidence and the credibility of the
witnesses, but in doing so, it must be careful not to usurp the

77

role of the jury." <u>United States v. Canova</u>, 412 F.3d 331, 348-49 (2d Cir. 2005).

As already discussed in detail, the evidence was more than sufficient to support the jury's verdict on all five counts. The credibility of each of the Government's witnesses was supported by the accounts of other witnesses, as well as by a myriad of documentary evidence.  Jordan does not point to any inconsistencies in the verdict, nor does he otherwise give any explanation for the basis of this challenge.  It is, therefore, rejected.

VI. Motion for Recusal

With his reply on the motion to set aside the verdict, Jordan also filed a motion for the District Judge's recusal pursuant to 28 U.S.C. § 455(a).  Based upon the Court's December 8 Order noting the discrepancy between the September 19 Letter received by the Court prior to the trial and the New Letter Jordan attached to his post-trial Rule 33 motion, Jordan's counsel contends that there could be a substantial question regarding the appearance of the District Judge's impartiality. He asserts that the District Judge has now become a victim of and witness to Jordan's fraudulent submission of the New Letter, and that this issue will be pertinent to Jordan's sentencing. These events do not suggest recusal.

Section 455(a) requires a judge to "recuse himself in any proceeding in which his impartiality might reasonably questioned."  28 U.S.C. § 455(a).  "The district judge has discretion in the first instance to determine whether to disqualify himself."  In re Basciano, 542 F.3d 950, 956 (2d Cir. 2008) (citation omitted).  In making this determination, the district court must "carefully weigh the policy of promoting public confidence in the judiciary against the possibility that those questioning his impartiality might be seeking to avoid the adverse consequences of his expected adverse decisions."  Id. (citation omitted).  The test focuses on "whether an objective, disinterested observer, fully informed of the underlying facts, would entertain significant doubt that justice would be done absent recusal."  Id. (citation omitted).

The scope of 28 U.S.C. § 455(a) "is commonly limited to those circumstances in which the alleged partiality stems from an extrajudicial source."  United States v. Carlton, 534 F.3d 97, 100 (2d Cir. 2008) (citation omitted).  Accordingly,

> opinions formed by the judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

LoCascio v. United States, 473 F.3d 493, 495-96 (2d Cir. 2007) (per curiam) (citation omitted).  Even "a judge's comments

during a proceeding that are critical or disapproving of, or
even hostile to, counsel, the parties, or their cases,
ordinarily do not support a bias or partiality challenge."
Carlton, 534 F.3d at 100 (citation omitted).

    Jordan offers no specific allegation of antagonism, let
alone bias by the District Judge.  The issues he raises stem
entirely from events which occurred as part of current
proceedings and do not constitute a basis for recusal.  After
all, any argument to the contrary might encourage a defendant to
attempt to obtain a new judge by falsifying a pro se submission
to the Court.  See In re Basciano, 542 F.3d at 957 ("Requiring a
judge to recuse himself because the defendant . . . has plotted
or threatened to kill the judge would provide any defendant who
wanted a new judge with an effective, if in some cases dreadful,
method to achieve that end.  A defendant cannot be permitted to
use such a plot or threat as a judge-shopping device.").


CONCLUSION

    The defendant's December 5 motion to set aside the verdict
on the five counts tried in October 2008 is denied.  The

defendant's December 22 motion for recusal is also denied.

SO ORDERED:

Dated:    New York, New York
          December 29, 2008

                                    _____
                                    DENISE COTE
                                    United States District Judge

81